Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff, MICHAEL HANSON

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL HANSON, on behalf of himself and all similarly situated persons,<br><br>          Plaintiff,<br><br>v.<br><br>TRIBUNE PUBLISHING COMPANY, LLC, a Delaware limited liability company,<br><br>          Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>1) Cal. Penal Code § 631<br>2) 18 U.S.C. § 2511(1)(a)<br>3) Cal. Bus. & Prof. Code § 17200, *et seq.*<br>4) Cal. Constitution Art. I § 1<br>5) Intrusion Upon Seclusion<br>6) Unjust Enrichment |

1

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Plaintiff MICHAEL HANSON ("Plaintiff") files this class action complaint on behalf of himself and all others similarly situated (the "Class Members") against Defendant TRIBUNE PUBLISHING COMPANY, LLC, a Delaware limited liability company ("Defendant" or "Tribune Publishing"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all others, by and through the investigation of undersigned counsel.

## I.   NATURE OF THE ACTION

1.   This is a class action lawsuit brought on behalf of all California residents who have accessed and used www.chicagotribune.com (the "Website"), a website that Defendant provides for public access and use.

2.   During his use of the Website, Plaintiff navigated to multiple pages on the Website, unaware that Defendant was causing and permitting Third Parties to intercept the content of his communications and reveal his personal and sensitive page views.

3.   Defendant caused the interception of the contents of Plaintiff's communications with the Website, including the page URLs identifying what he was browsing and/or the referrer URLs reflecting prior navigation, which were transmitted to the Third Parties during the page-load process itself.

4.   As set forth in the Specific Allegations section of this Complaint below, Defendant surreptitiously embeds and operates third-party tracking technologies on the Website that intercept the contents of users' electronic communications, including the page URLs reflecting what users are browsing, in real time and without notice or consent. Defendant intentionally deploys these technologies to accomplish its commercial objectives, including identity resolution, cross-session behavioral profiling, audience segmentation, and the monetization of users' browsing activity through targeted advertising and real-time bidding.

5.   Defendant deploys these interception technologies in violation of the California Invasion of Privacy Act, Cal. Penal Code § 631, and the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a). Defendant has done so from prior to the beginning of the class

period in this case and continuously through to today and ongoingly.

## II.   GENERAL ALLEGATIONS

6.    A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website that monitors user interactions. It typically appears as a small, transparent 1x1 image or a lightweight JavaScript snippet that activates when a webpage is loaded, or a user performs a tracked action.

7.    When triggered, the pixel causes the user's browser to transmit data to third-party servers, including the contents of the user's communications with the Website such as page URLs identifying what the user is browsing, referrer URLs reflecting prior navigation, session-level identifiers, and browser and device characteristics.

8.    When users visit the Website, Defendant causes tracking technologies to be embedded in visitors' browsers. These include, but are not limited to, the following:

- The Comscore Tracker
- The Trade Desk Tracker
- The LiveIntent Tracker
- The Mountain Network Tracker

9.    The third parties who operate the above-listed trackers use the intercepted contents of users' communications collected via the Website for their own independent purposes tied to broader advertising ecosystems, profiling, and data monetization strategies, which go beyond Defendant's direct needs, for their own financial gain. The above-listed trackers are referred to herein collectively as the "Trackers" and their operators below are referred to collectively as the "Third Parties."

10.    The Trackers are operated by distinct third parties, including Comscore, Inc., also branded as Scorecardresearch (as to the Comscore audience-measurement tracker), The Trade Desk, Inc. (as to the Trade Desk programmatic-advertising tracker), LiveIntent, Inc. (as to the LiveIntent identity-resolution tracker), and Mountain Network (as to the Mountain Network identity-resolution and tracking platform) (collectively, the "Third Parties"). Defendant knowingly embeds and deploys the Trackers on the Website

3

to facilitate the third parties' interception of the contents of users' electronic communications.

11.    The third-party tracking code executed contemporaneously with each page load and navigation event initiated by Plaintiff's browser. As the browser initiated each HTTP request to retrieve Website content, embedded scripts automatically caused the interception and transmission of the contents of users' communications with the Website to remote third-party endpoints during the page-load process itself, before the requested page finished rendering and without any user interaction or authorization.

12.    Plaintiff and the Class Members did not consent to the installation, execution, embedding, or injection of the Trackers on their devices and did not consent to the contents of their communications with the Website being intercepted by third parties. The Website did not display any consent banner, pop-up, cookie notice, or other authorization mechanism requesting permission before deploying the Trackers to intercept user communications. Defendant did not obtain express prior consent for the interception and transmission of the contents of users' communications for advertising, analytics, or monetization purposes.

13.    Generalized references herein to users, visitors and consumers expressly include Plaintiff and the Class Members.

### III.    PARTIES

14.    Plaintiff MICHAEL HANSON is a California citizen residing in San Bernardino County, CA and has an intent to remain there. Plaintiff was in California when he visited the Website, which occurred during the class period including but not limited to on May 2, 2026. The allegations set forth herein are based on the Website as configured when Plaintiff visited it.

15.    Tribune Publishing Company, LLC is a Delaware limited liability company that owns, operates, and controls the Website, an online news platform through which Tribune Publishing publishes daily news, political reporting, local Chicago coverage, opinion essays, and editorial coverage of national and international current events for

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

readers nationwide. Tribune Publishing operates a portfolio of major-metropolitan-newspaper digital properties and is a leading regional newspaper publisher.

16. Defendant maintains its principal offices in Chicago, Illinois. Through the Website and related digital platforms, Tribune Publishing conducts media and publishing business nationwide and serves readers in California and throughout the United States.

## IV.   JURISDICTION AND VENUE

17. Tribune Publishing Company, LLC is subject to personal jurisdiction in this District under Federal Rule of Civil Procedure 4(k)(1)(A) and California's long-arm statute, Cal. Code Civ. Proc. § 410.10, which authorizes the exercise of jurisdiction on any basis not inconsistent with the United States or California Constitutions.

18. Tribune Publishing has cultivated California as a substantial market for its digital news, political reporting, opinion content, and editorial coverage. The Website serves as a primary digital channel through which Tribune Publishing distributes its national news, political reporting, opinion essays, and editorial content to California readers.

19. In furtherance of those operations, Tribune Publishing entered into and maintained commercial partnerships with California-headquartered data and advertising companies, including The Trade Desk, Inc., headquartered in Ventura, California. Tribune Publishing also embedded the Comscore, LiveIntent, and Mountain Network Trackers on the Website, each of which participates in the same programmatic-advertising and identity-resolution ecosystem that Tribune Publishing deliberately integrated with through The Trade Desk.

20. Through those partnerships, Tribune Publishing embedded third-party tracking technologies into the Website that transmit California users' communications to data infrastructure and servers operated by California-headquartered companies, including The Trade Desk, Inc. Plaintiff, a California resident, accessed the Website from California; the interception of his communications occurred on his device in

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

California; and the intercepted data flowed to servers operated by The Trade Desk, Inc., which operates from California. Plaintiff's claims arise directly from Tribune Publishing's purposeful direction of its Website and embedded data-collection systems at California residents and its use of California-based infrastructure to capture and exploit their private communications.

21. Tribune Publishing deliberately reached out beyond its home state of Delaware and its Chicago, Illinois principal offices by knowingly installing the Comscore, Trade Desk, LiveIntent, and Mountain Network Trackers onto unsuspecting California users' devices so that it could later use and monetize the data it obtained from those Trackers, in a manner that was neither random, isolated, nor fortuitous.

22. Tribune integrates the Website with a California-anchored ad-tech ecosystem extending beyond the four Trackers identified in this Complaint. During Plaintiff's use of the Website, Tribune Publishing activated additional California-headquartered programmatic-advertising and identity-resolution partners, including Google LLC (Mountain View), Magnite, Inc. (Los Angeles), PubMatic, Inc. (Redwood City), and Nativo, Inc. (El Segundo). Tribune Publishing's deliberate integration with this California-anchored ecosystem confirms that Tribune Publishing purposefully directed its data-collection, tracking, and ad-monetization conduct at California.

23. Tribune Publishing's own Privacy Policy confirms the conduct alleged herein. The Privacy Policy expressly identifies the categories of personal information that Tribune Publishing collects from visitors to its Services, including information about the specific pages of the Services visitors view, the search terms visitors submit through the Services, the content visitors interact with on the Services, and inferences drawn from that information about visitors' preferences and behavior.

24. Tribune Publishing's Privacy Policy further admits that Tribune Publishing discloses those categories of personal information to third parties for purposes of online analytics and interest-based advertising, and that those disclosures may constitute a "sale" or "share" of personal information under the California Consumer Privacy Act

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

and the California Privacy Rights Act, collectively the California Privacy Laws. The Cookie Policy correspondingly admits that Tribune Publishing uses cookies and other tracking technologies on its Platform, including third-party cookies set by advertisers, analytics providers, and other third-party providers, and that those cookies allow third parties to track users across Tribune Publishing's Platform.

25.    These admitted categories of data, including the specific pages visitors view on the Services, the search terms visitors submit, content interactions, and inferences drawn from those interactions, constitute the substance of visitors' electronic communications with the Website, and are the same categories of content-level browsing data that the Trackers intercepted from Plaintiff during his visits to the URLs identified herein.

26.    Tribune Publishing's purposeful direction of its tracking infrastructure at California, its commercial partnerships with California-headquartered Trackers, and its admissions in its own Privacy Policy and Cookie Policy collectively establish that Tribune Publishing has purposefully availed itself of the privilege of conducting activities in California and has purposefully directed its conduct at California residents.

27.    Plaintiff's claims arise out of and relate to Tribune Publishing's forum-related conduct. Plaintiff's communications were intercepted on his device in California, while Plaintiff was located in California, by Trackers Tribune Publishing deliberately embedded on its Website. The intercepted data was routed to California-based servers operated by The Trade Desk, Inc., and other California-headquartered ad-tech partners identified above.

28.    Exercising specific personal jurisdiction over Tribune Publishing in this District comports with constitutional notions of fair play and substantial justice. Tribune Publishing is an established media and publishing company with substantial commercial operations directed at California residents, and Tribune Publishing cannot reasonably claim surprise or undue burden from being haled into a California federal court to answer claims arising from interception of California residents' communications via Trackers

7

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Tribune Publishing itself embedded on its Website.

29. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff asserts a claim arising under federal law, specifically 18 U.S.C. § 2520, which provides a civil cause of action for violations of 18 U.S.C. § 2511(1)(a) of the Federal Wiretap Act.

30. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claim that they form part of the same case or controversy under Article III of the United States Constitution.

31. This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000, exclusive of interest and costs, there are over 100 members of the proposed Class, and at least one Class Member is a citizen of a State different from Defendant's state of citizenship, satisfying CAFA's minimal-diversity requirement.

32. Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b) because (1) Defendant regularly transacts business in this District, operates the Website that serves California residents in this District, and is subject to personal jurisdiction here; (2) a substantial part of the events or omissions giving rise to the claims occurred within this District, including Plaintiff's California-located use of the Website from his San Bernardino County residence; (3) Plaintiff resides in this District; and (4) Defendant derives substantial revenue from California consumers in this District.

## V.   FEDERAL AND STATE PRIVACY LAWS

### 1.   The California Invasion of Privacy Act (CIPA)

33. The California Invasion of Privacy Act (CIPA) is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications. The California Legislature recognized the significant threat posed by emerging surveillance technologies, stating that "the development of new devices and techniques for the

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

purpose of eavesdropping upon private communications ... has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society" (Cal. Penal Code § 630).

34. Despite predating the Internet, CIPA has been applied to email and other Internet communications so long as that application is consistent with the statutory text and purpose. Section 631(a) reaches the interception of email content and online communications and consent under CIPA must be obtained before the interception occurs.

35. CIPA's text and history confirm that the Legislature intended to protect core privacy rights, as reflected in § 630's declaration that the statute was enacted to protect the right of privacy of the people of this state. CIPA codifies a substantive right to privacy such that the violations of CIPA alleged herein constitute concrete injuries sufficient to establish Article III standing.

36. Individuals may pursue legal action against violators of Cal. Penal Code § 631 and are entitled to seek $5,000 in statutory penalties per violation. Cal. Penal Code § 637.2(a)(1).

**2.      The Federal Wiretap Act**

37. The Federal Wiretap Act, enacted as Title III of the Omnibus Crime Control and Safe Streets Act of 1968 and amended by the Electronic Communications Privacy Act (ECPA) of 1986, prohibits the intentional interception of wire, oral, or electronic communications. Congress enacted the statute to safeguard the privacy of communications against unauthorized interception, recognizing that unchecked surveillance technology poses a fundamental threat to individual liberty.

38. The Federal Wiretap Act applies to communications transmitted over the Internet. The 1986 ECPA amendments expressly extended the statute's protections to electronic communications as defined under 18 U.S.C. § 2510(12) to include "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or

photooptical system that affects interstate or foreign commerce." That includes data transmitted over the internet such as the contents of web browsing activity via HTTP requests as alleged here.

39.     A person whose electronic communications are intercepted in violation of 18 U.S.C. § 2511 may bring a civil action pursuant to 18 U.S.C. § 2520(a). Available relief includes the greater of actual damages or statutory damages of $100 per day for each day of violation or $10,000, whichever is greater, plus punitive damages in appropriate cases, reasonable attorney's fees, and other litigation costs reasonably incurred.

## VI.     SPECIFIC ALLEGATIONS

40.     During his use of the Website, Plaintiff navigated to the following pages, unaware that Defendant was causing and permitting Third Parties to intercept the content of his communications:

- https://www.chicagotribune.com/?s=transgender&orderby=date& order=desc; and

- https://www.chicagotribune.com/2026/04/13/trump-administration-agrees-to-keep-flying-rainbow-pride-flag-at-new-yorks-stonewall-monument/.

41.     Plaintiff alleges on information and belief that the tracking mechanisms described below operated on the Website during Plaintiff's visits to the URLs identified above and intercepted the substantive contents of his communications with the Website. Beyond the URLs, each Tracker receives, during each of those page loads, the page URLs identifying the content Plaintiff was viewing transmitted as named payload parameters, and the source-page URL transmitted in the Referer header or, in Mountain's case, in the referer URL parameter. Each of those fields communicates the substance, purport, or meaning of what Plaintiff was reading or searching for on the Website, and is therefore content of Plaintiff's electronic communications within the meaning of Cal. Penal Code § 631(a) and 18 U.S.C. § 2510(8). Each Tracker section below illustrates

what occurs during live browser access to those pages.

**1.** *The Comscore Tracker*

42. Defendant embedded and deployed a Comscore audience-measurement tracker on the Website, operated by Comscore, Inc. through its Scorecardresearch platform. The Comscore tracker fires automatically when a user visits the Website, transmitting Tribune Publishing's registered Comscore Publisher/Site ID, the page URL, and the page title to Comscore's data collection servers at sb.scorecardresearch.com, and simultaneously links the request to persistent third-party cookies stored on the visitor's browser. Comscore, Inc. operates one of the largest audience-measurement and digital-analytics platforms in the world, using intercepted browsing data for cross-publisher audience measurement, behavioral profiling, and targeted advertising.

43. Plaintiff visited the Website at https://www.chicagotribune.com/?s=transgender&orderby=date&order=desc, a search-results URL that, on its face, communicates the substance of Plaintiff's search query to anyone who reads the URL. When Plaintiff navigated to that URL, the Website caused Plaintiff's browser to transmit a Comscore tracking request to sb.scorecardresearch.com that carried the page URL, the page title, and the source-page URL contemporaneously with persistent third-party cookies on .scorecardresearch.com. The page URL and the persistent identifier appeared in the same outbound request.

44. Figure 1 is a Fiddler Classic raw request capture showing a GET request transmitted to Comscore's data collection servers at sb.scorecardresearch.com. The request displays Tribune Publishing's Comscore Publisher/Site ID, the page URL containing the transgender search query in the c7 parameter, the page title encoded in the c8 parameter, and the Referer header pointing to https://www.chicagotribune.com/?s=transgender&orderby=date&order=desc, establishing that the page URL identifying what was being browsed was transmitted to Comscore in the same outbound request as the persistent identifier-bearing cookie context.

11

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 1**



45.    Plaintiff    also    visited    the    Website    at https://www.chicagotribune.com/2026/04/13/trump-administration-agrees-to-keep-flying-rainbow-pride-flag-at-new-yorks-stonewall-monument/, an article URL that, on its face, communicates the substance of the article (Trump administration, Pride flag, Stonewall Monument). When Plaintiff navigated to that URL, the Website again caused Plaintiff's browser to transmit a Comscore tracking request to sb.scorecardresearch.com that carried the page URL in the c7 parameter, the page title in the c8 parameter, and the source-page URL in the Referer header, with the same persistent third-party cookies.

46.    Figure 2 is a Fiddler Classic raw request capture showing a second GET request to sb.scorecardresearch.com. The request displays Tribune Publishing's Comscore Publisher/Site ID c2=6035443, the page URL of the Trump/Pride/Stonewall article in the c7 parameter, the article title in the c8 parameter, and the Referer header pointing to https://www.chicagotribune.com/2026/04/13/trump-administration-agrees-to-keep-flying-rainbow-pride-flag-at-new-yorks-stonewall-monument/,    with Comscore's server returning an HTTP 204 No Content response confirming receipt and

12

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

processing of the transmission.

**Figure 2**

47.    Comscore's servers at sb.scorecardresearch.com returned an HTTP 204 No Content response to the tracking requests, confirming that Comscore received and processed the transmitted data in real time, during the transmission of Plaintiff's communications with the Website.

48.    Comscore, Inc. used the intercepted browsing data, including the URLs identifying Plaintiff's browsing activity for cross-publisher audience measurement, behavioral profiling, and the construction of audience segments that are made available to advertisers and ad-technology partners through Comscore's commercial products. The persistent UID and XID cookies set on .scorecardresearch.com, with approximately 390-day expirations, enable Comscore to link Plaintiff's communications with the Website to a continuing user profile across sessions. This commercial use of intercepted content is precisely what the Comscore tracker is designed and marketed to accomplish.

49.    Comscore, Inc. is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured those communications as they occurred. Defendant aided and abetted Comscore's

interception by embedding and configuring the Comscore tracker on the Website. By causing Comscore to intercept the contents of Plaintiff's electronic communications with the Website in this manner, Defendant violated Cal. Penal Code § 631 and 18 U.S.C. § 2511(1)(a).

**2.** ***The Trade Desk Tracker***

50.     Defendant embedded and deployed The Trade Desk programmatic-advertising tracker on the Website, operated by The Trade Desk, Inc. through its demand-side platform. The Trade Desk tracker fires automatically when a user visits the Website, transmitting OpenRTB bid-request payloads identifying the page being viewed to The Trade Desk's servers at direct.adsrvr.org, and simultaneously linking those payloads to persistent third-party cookies (TDID and TDCPM) on .adsrvr.org. The Trade Desk, Inc. operates one of the largest demand-side platforms in programmatic advertising, using intercepted browsing data to build behavioral profiles, power real-time bidding auctions, and enable interest-based advertising campaigns across its programmatic ecosystem.

51.     When Plaintiff navigated to https://www.chicagotribune.com/?s=transgender&orderby=date&order=desc, the Website caused Plaintiff's browser to transmit a Trade Desk OpenRTB POST request to direct.adsrvr.org/bid/bidder/tribune. The POST body carried the page URL of the search-results page in the site.page field of the OpenRTB payload, contemporaneously with the TDID persistent cookie on .adsrvr.org. The page URL and the persistent identifier appeared in the same outbound request.

52.     Figure 3 is a Fiddler Classic raw request capture showing the POST request to direct.adsrvr.org/bid/bidder/tribune. The request displays the OpenRTB bid-request payload containing the site.page value referencing the chicagotribune.com transgender search URL, the Referer header pointing to https://www.chicagotribune.com/?s=transgender&orderby=date&order=desc, the us_privacy=1YN- parameter (the third character N confirming that no opt-out was

applied), and The Trade Desk's server returning an HTTP 200 OK response with bid-response payloads, establishing that The Trade Desk received and processed the transmission carrying the URL of the transgender search page.

**<u>Figure 3</u>**



53.    When Plaintiff navigated to https://www.chicagotribune.com/2026/04/13/trump-administration-agrees-to-keep-flying-rainbow-pride-flag-at-new-yorks-stonewall-monument/, the Website again caused Plaintiff's browser to transmit a Trade Desk OpenRTB POST request to direct.adsrvr.org/bid/bidder/tribune. The POST body carried the page URL of the Trump/Pride/Stonewall article in the site.page field of the OpenRTB payload, contemporaneously with the TDID persistent cookie.

54.    Figure 4 is a Fiddler Classic raw request capture showing a second POST request to direct.adsrvr.org/bid/bidder/tribune. The request displays the OpenRTB bid-request payload containing the site.page value referencing the chicagotribune.com Trump/Pride/Stonewall article URL, the Referer header pointing to that article, and The Trade Desk's server returning an HTTP 200 OK response, establishing that The Trade

15

Desk received and processed the transmission carrying the URL of the LGBTQ-related article.

## Figure 4



55.    The Trade Desk's servers at direct.adsrvr.org returned HTTP 200 OK responses to the bid-request transmissions, confirming that The Trade Desk received and processed the transmitted data in real time, during the transmission of Plaintiff's communications with the Website.

56.    The Trade Desk, Inc. used the intercepted browsing data, including the URLs identifying Plaintiff's browsing activity to build behavioral profiles, power real-time bidding auctions, and enable interest-based advertising campaigns across The Trade Desk's programmatic-advertising ecosystem. The persistent TDID cookie set on .adsrvr.org, with an approximate 365-day expiration, enables The Trade Desk to link Plaintiff's communications with the Website to a continuing user profile across sessions, devices, and websites. This commercial use of intercepted content is precisely what The Trade Desk programmatic-advertising tracker is designed and marketed to accomplish.

57.    The Trade Desk, Inc. is not a party to the communications between Plaintiff

16

and the Website; it is a third-party interceptor that surreptitiously duplicated and captured those communications as they occurred. Defendant aided and abetted The Trade Desk's interception by embedding and configuring the Trade Desk programmatic-advertising tracker on the Website. By causing The Trade Desk to intercept the contents of Plaintiff's electronic communications with the Website in this manner, Defendant violated Cal. Penal Code § 631 and 18 U.S.C. § 2511(1)(a).

**3.    *The LiveIntent Tracker***

58.    Defendant embedded and deployed the LiveIntent identity-resolution tracker on the Website, operated by LiveIntent, Inc. through its identity-resolution platform. The LiveIntent tracker fires automatically when a user visits the Website, transmitting the page URL of the page being viewed to LiveIntent's servers at rp.liadm.com and rp4.liadm.com as a named pu= parameter, and simultaneously links the request to persistent identifiers stored on the visitor's browser. Critically, LiveIntent's _lc2_fpi cookie is stored on Tribune Publishing's own .chicagotribune.com domain as a first-party cookie with an approximate 730-day expiration, enabling LiveIntent to track users via the first-party cookie mechanism, bypassing third-party cookie restrictions imposed by modern browsers. LiveIntent, Inc. operates one of the largest people-based identity-resolution platforms in the digital advertising industry, using intercepted browsing data for cross-publisher identity resolution, audience targeting, and email-linked advertising.

59.    When Plaintiff navigated to https://www.chicagotribune.com/?s=transgender&orderby=date&order=desc, the Website caused Plaintiff's browser to transmit LiveIntent tracking requests to rp.liadm.com and rp4.liadm.com. The requests carried the page URL of the search-results page in the pu= parameter, a persistent device identifier in the duid= parameter, and the source-page URL in the Referer header, contemporaneously with the lidid third-party cookie on .liadm.com and the _lc2_fpi first-party cookie on .chicagotribune.com. The page URL and the persistent identifiers appeared in the same outbound request.

17

60.     Figure 5 is a Fiddler Classic raw request capture showing a GET request transmitted to LiveIntent's servers at rp4.liadm.com. The request displays the page URL of the chicagotribune.com transgender search page in the pu= parameter, the duid= persistent device identifier, the Referer header pointing to https://www.chicagotribune.com/?s=transgender&orderby=date&order=desc, the us_privacy=1YN- parameter (the third character N confirming that no opt-out was applied), and LiveIntent's server returning an HTTP 200 OK response, establishing that LiveIntent received and processed the transmission carrying the URL of the transgender search page.

**Figure 5**

61.     On information and belief, when Plaintiff navigated to https://www.chicagotribune.com/2026/04/13/trump-administration-agrees-to-keep-flying-rainbow-pride-flag-at-new-yorks-stonewall-monument/, the Website caused Plaintiff's browser to transmit LiveIntent tracking requests carrying the page URL of the Trump/Pride/Stonewall article and the persistent identifiers described above.

///

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

62. Figure 6 is a Fiddler Classic raw request capture showing a GET request transmitted to LiveIntent's servers at rp4.liadm.com. The request displays the page URL of the Trump/Pride/Stonewall article in the pu= parameter, a persistent device identifier in the duid= parameter, and the Referer header pointing to https://www.chicagotribune.com/2026/04/13/trump-administration-agrees-to-keep-flying-rainbow-pride-flag-at-new-yorks-stonewall-monument/, establishing that LiveIntent received the URL of the LGBTQ-related article in the same outbound request as the persistent identifiers.

**Figure 6**

63. LiveIntent's servers returned HTTP 302 responses (rp.liadm.com) and HTTP 200 responses (rp4.liadm.com) to the tracking requests, confirming that LiveIntent received and processed the transmitted data in real time, during the transmission of Plaintiff's communications with the Website.

64. LiveIntent, Inc. used the intercepted browsing data, including the URLs identifying Plaintiff's browsing activity concerning sexual orientation, gender identity, and LGBTQ-related content, to perform cross-publisher identity resolution, build

19

addressable audience segments, and enable email-linked advertising across the LiveConnect ecosystem. The persistent lidid cookie on .liadm.com (approximately 730-day expiration) and, critically, the _lc2_fpi first-party cookie stored on Tribune Publishing's own .chicagotribune.com domain (approximately 730-day expiration), enable LiveIntent to link Plaintiff's communications with the Website to a continuing user profile across sessions, publishers, and email touchpoints, while bypassing third-party cookie restrictions imposed by modern browsers. This commercial use of intercepted content is precisely what the LiveIntent identity-resolution tracker is designed and marketed to accomplish.

65. LiveIntent, Inc. is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured those communications as they occurred. Defendant aided and abetted LiveIntent's interception by embedding and configuring the LiveIntent tracker on the Website, including the configuration that allows LiveIntent's _lc2_fpi cookie to be stored on Tribune Publishing's own first-party domain. By causing LiveIntent to intercept the contents of Plaintiff's electronic communications with the Website in this manner, Defendant violated Cal. Penal Code § 631 and 18 U.S.C. § 2511(1)(a).

**4.    *The Mountain Network Tracker***

66. Defendant embedded and deployed the Mountain Network identity-resolution and tracking platform on the Website, operated by Mountain Network. The Mountain Network tracker fires automatically when a user visits the Website, transmitting the page URL of the page being viewed and the source-page URL identifying the prior navigation to Mountain Network's servers at px.mountain.com as named url= and referer= parameters, and simultaneously links the request to a persistent guid cookie stored on the visitor's browser on .mountain.com with an approximate 365-day expiration. Mountain Network operates an identity-resolution and audience-tracking platform that ingests browsing data from multiple publishers and uses it to build cross-publisher user profiles for advertising and analytics.

67. On information and belief, when Plaintiff navigated to https://www.chicagotribune.com/?s=transgender&orderby=date&order=desc, Mountain Network intercepted that URL's contents through Tribune Publishing's tracking infrastructure. The interception is established by Mountain Network's subsequent transmission of the URL 1 (transgender search) URL as the source-page in the referer= parameter on the Mountain Network request that fired during Plaintiff's navigation to URL 2, identifying the URL 1 search-results page as the prior navigation.

68. Figure 7 is a Fiddler Classic raw request capture showing a GET request transmitted to Mountain Network's servers at px.mountain.com. The request displays the chicagotribune.com transgender search URL in named URL parameters, the Referer header pointing to https://www.chicagotribune.com/, and Mountain Network's server returning an HTTP 200 OK response, establishing that Mountain Network received and processed the transmission carrying the URL identifying the transgender search activity.

**<u>Figure 7</u>**

69. When Plaintiff navigated to https://www.chicagotribune.com/2026/04/13/trump-administration-agrees-to-keep-

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

flying-rainbow-pride-flag-at-new-yorks-stonewall-monument/, the Website caused Plaintiff's browser to transmit a Mountain Network tracking request to px.mountain.com that carried the page URL of the Trump/Pride/Stonewall article in the url= parameter, the source-page URL of the prior transgender search results page in the referer= parameter, and the persistent guid cookie on .mountain.com. The page URLs and the persistent identifier appeared in the same outbound request.

70. Figure 8 is a Fiddler Classic raw request capture showing the GET request transmitted to Mountain Network's servers at px.mountain.com. The request displays the chicagotribune.com Trump/Pride/Stonewall article URL in the url= parameter, the chicagotribune.com transgender search URL in the referer= parameter, the persistent guid cookie value, and Mountain Network's server returning an HTTP 200 OK response, establishing that Mountain Network received the contents of two distinct LGBTQ-related communications (the article URL and the prior search URL) in the same outbound request.

**Figure 8**

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

71.    Mountain Network's servers at px.mountain.com returned HTTP 200 OK responses to the tracking requests, confirming that Mountain Network received and processed the transmitted data in real time, during the transmission of Plaintiff's communications with the Website.

72.    Mountain Network used the intercepted browsing data, including the URLs identifying Plaintiff's browsing activity concerning sexual orientation, gender identity, and LGBTQ-related content, to build cross-publisher identity-resolution profiles and audience segments that are made available to advertisers and ad-technology partners through Mountain Network's commercial products. The persistent guid cookie set on .mountain.com, with an approximate 365-day expiration, enables Mountain Network to link Plaintiff's communications with the Website to a continuing user profile across sessions, devices, and publishers. This commercial use of intercepted content is precisely what the Mountain Network tracker is designed and marketed to accomplish.

73.    Mountain Network is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured those communications as they occurred. Defendant aided and abetted Mountain Network's interception by embedding and configuring the Mountain Network tracker on the Website. By causing Mountain Network to intercept the contents of Plaintiff's electronic communications with the Website in this manner, Defendant violated Cal. Penal Code § 631 and 18 U.S.C. § 2511(1)(a).

**5.    *Persistent Identifier Storage Across the Trackers***

74.    The Trackers' persistent identifier mechanisms are stored on the visitor's browser as cookies. Figures 9 and 10 are Chrome DevTools Application panel captures showing the browser's cookie storage during the load of the two sensitive URLs. The persistent identifiers shown include third-party cookies on each Tracker's own domain (Comscore's UID and XID on .scorecardresearch.com; The Trade Desk's TDID and TDCPM on .adsrvr.org; LiveIntent's lidid on .liadm.com; Mountain Network's guid on .mountain.com) and, critically, LiveIntent's first-party _lc2_fpi cookie stored on Tribune

Publishing's own .chicagotribune.com domain. The first-party cookie mechanism enables LiveIntent to track users via the first-party cookie path, bypassing third-party cookie restrictions imposed by modern browsers. The persistent identifiers, with expirations extending through 2027 (390 days for Comscore UID and XID; 365 days for Trade Desk TDID; 730 days for LiveIntent lidid and _lc2_fpi; 365 days for Mountain guid), confirm long-term tracking capability across all four Trackers.

75.    Figure 9 is a Chrome DevTools Application panel capture displayed alongside the Chicago Tribune transgender search results page (URL bar visible at https://www.chicagotribune.com/?s=transgender&orderby=date&order=desc), showing the browser's Cookies storage during the load of the transgender search URL. The Application panel shows third-party cookies stored on each Tracker's own domain (.scorecardresearch.com, .adsrvr.org, .liadm.com) and first-party cookies stored on the .chicagotribune.com domain, including LiveIntent's _lc2_fpi first-party cookie.

**Figure 9**



76.    Figure 10 is a Chrome DevTools Application panel capture displayed alongside the Chicago Tribune Trump/Pride/Stonewall article page (URL bar visible at

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

the article URL), showing the browser's Cookies storage during the load of the LGBTQ-related article URL. The Application panel shows third-party cookies stored on .scorecardresearch.com (UID and XID), .adsrvr.org (TDID and TDCPM), and on the .chicagotribune.com first-party domain (including the LiveIntent _lc2_fpi, _lc2_fpi_js, and lc2_fpi_meta entries), with multi-year expirations through 2027.

**Figure 10**



77.     Together, Figures 9 and 10 confirm that each of the four Trackers maintains a persistent identifier mechanism on the visitor's browser that survives across multiple sensitive page loads in a single session, enabling each Tracker to link Plaintiff's communications with the Website to a continuing user profile across sessions, devices, and contexts.

**6.     *Real-Time Tracker Activation During Page Load***

78.     The Trackers fire automatically during the Website's page-load process, contemporaneously with (and while) Plaintiff's communications with the Website are in transit. Figures 11 and 12 are network waterfall captures showing the page-load timing for each of the two sensitive URLs. Each waterfall demonstrates that the Trackers'

25

outbound requests fire during the same time window in which the Website delivers the requested page contents to the user's browser, and before the page-load process has completed. No user interaction is required to trigger the Tracker requests, which fire automatically as part of the page-load process.

79.   Figure 11 is a network waterfall capture for the page load of https://www.chicagotribune.com/?s=transgender&orderby=date&order=desc.   The capture displays the first-party Tribune Publishing request for the search-results page at the top of the waterfall, followed by the Tracker requests firing during the same load window: sb.scorecardresearch.com (Comscore), direct.adsrvr.org (Trade Desk), and liadm.com (LiveIntent), all firing before the page load completed.

**Figure 11**



80.   Figure 12 is a network waterfall capture for the page load of https://www.chicagotribune.com/2026/04/13/trump-administration-agrees-to-keep-flying-rainbow-pride-flag-at-new-yorks-stonewall-monument/. The capture displays the first-party Tribune Publishing request for the article page at the top of the waterfall, followed by the Tracker requests firing during the same load window: sb.scorecardresearch.com (Comscore), direct.adsrvr.org (Trade Desk), liadm.com (LiveIntent), and px.mountain.com (Mountain Network), all firing before the page load completed.

/ / /

26

**Figure 12**



81.     Together, Figures 11 and 12 confirm that the Trackers' interception of Plaintiff's communications with the Website occurs in real time, while those communications are in transit between Plaintiff's browser and the Website's servers, and before the page-load process has completed.

## VII.   CLASS ALLEGATIONS

82.     Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members") defined as follows:

> All persons within California whose electronic communications with the Website, including the URL contents of their HTTP requests to the Website, were intercepted by one or more Trackers between May 2, 2025 and the present.

83.     NUMEROSITY: Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members can be ascertained by the records maintained by Defendant.

84.     COMMONALITY: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions include but are not limited to:

- Whether Defendant configured the Website to transmit the URL contents of visitors' HTTP requests to the Trackers;

- Whether the URL contents of those requests constitute "contents" of

27

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

electronic communications within the meaning of Cal. Penal Code § 631(a) and 18 U.S.C. § 2510(8);

- Whether Defendant's conduct constitutes interception of electronic communications in violation of Cal. Penal Code § 631(a);

- Whether Defendant's conduct constitutes intentional interception of electronic communications in violation of 18 U.S.C. § 2511(1)(a);

- Whether Defendant's conduct constitutes an unlawful or unfair business practice under Cal. Bus. & Prof. Code § 17200;

- Whether Plaintiff and Class Members are entitled to statutory damages;

- Whether Class Members are entitled to injunctive relief;

- Whether the Defendant's conduct violates the California Constitution;

- Whether the Defendant's conduct constitutes an intrusion upon seclusion;

- Whether Class Members are entitled to disgorgement of data unlawfully obtained; and

- Whether Class Members are entitled to restitution.

85. TYPICALITY: As a person who visited the Website and whose URL contents were intercepted by the Trackers, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Trackers is typical to Class Members.

86. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

87. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation

28

also presents a potential for inconsistent or contradictory judgments.

## VIII.  FIRST CAUSE OF ACTION

### Violations of Cal. Penal Code § 631

### By Plaintiff and the Class Members Against All Defendants

88.  Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

89.  Plaintiff brings this cause of action on behalf of himself and the Class.

90.  California Penal Code § 631(a) prohibits any person from willfully and without the consent of all parties to the communication reading, or attempting to read, or learning the contents or meaning of any message, report, or communication while the same is in transit, and from using or attempting to use, in any manner or for any purpose, any information so obtained.

91.  The full URLs of Plaintiff's and Class members' HTTP requests to the Website constitute the "contents" of those communications within the meaning of § 631(a). As described in the preceding tracker-specific allegations, the Trackers received human readable copies of URL strings in the same HTTP request or response in which the Website servers received it, while that communication was in transit between Plaintiff's browser and the Website.

92.  Defendant intentionally configured its website to transmit Plaintiff's and Class members' URL contents to the Trackers, itself received and used those URL contents for audience segmentation and ad targeting, and permitted the Trackers to use that information for user profiling and targeted advertising. The Trackers are third parties to the communications between Plaintiff and the Website. Plaintiff and Class members did not consent to interception of the contents of their communications by any Tracker, and no other exception to § 631(a) applies.

93.  Each interception constitutes a separate violation of § 631(a). Plaintiff and the Class are entitled to recover the greater of actual damages or $5,000 per violation pursuant to Cal. Penal Code § 637.2(a)(1), injunctive relief, and such other relief as the

29

Court deems just and proper.

## IX.   SECOND CAUSE OF ACTION

### Violations of 18 U.S.C. § 2511(1)(a)

### By Plaintiff and the Class Members Against All Defendants

94.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

95.   Plaintiff brings this cause of action on behalf of himself and the Class.

96.   18 U.S.C. § 2511(1)(a) prohibits any person from intentionally intercepting any wire, oral, or electronic communication. The Federal Wiretap Act defines "contents" to include any information concerning the substance, purport, or meaning of a communication. 18 U.S.C. § 2510(8).

97.   The full URLs of Plaintiff's and Class members' HTTP requests to the Website are "contents" of electronic communications within the meaning of 18 U.S.C. § 2510(8). Those URLs communicate the substance and meaning of Plaintiff's and Class members' browsing. As described in the preceding tracker-specific allegations, the Trackers intercepted URL contents in real time, in the same HTTP request or response in which the Website's servers received them, while those communications were in transit.

98.   Defendant intentionally configured its website to transmit Plaintiff's and Class members' URL contents to each Tracker, itself received and used those URL contents for audience segmentation and ad targeting, and permitted each Tracker to use that information for user profiling and targeted advertising. The Trackers are third parties to the communications between Plaintiff and the Website. Plaintiff and Class members did not consent to this interception, and no other exception applies.

99.   Plaintiff and the Class are entitled to relief under 18 U.S.C. § 2520, including the greater of actual damages plus any profits made by Defendant through the interception, or statutory damages of $100 per day per violation or $10,000, whichever is greater, together with punitive damages, reasonable attorney's fees, and litigation

30

costs.

## X. THIRD CAUSE OF ACTION

### Violations of Business & Professions Code § 17200

### By Plaintiff and the Class Members Against All Defendants

100. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

101. Plaintiff brings this cause of action on behalf of himself and the Class.

102. California Business and Professions Code § 17200 prohibits any unlawful, unfair, or fraudulent business act or practice. Defendant's conduct constitutes both an unlawful and an unfair business practice.

103. Defendant's conduct is unlawful. By facilitating the interception of the contents of Plaintiff's and Class members' electronic communications without consent, Defendant violated California Penal Code § 631(a) and 18 U.S.C. § 2511(1)(a). Each statutory violation constitutes a predicate unlawful business act or practice under § 17200.

104. Defendant's conduct is also unfair. Defendant covertly transmitted Plaintiff's and Class members' URL contents to third-party Trackers for commercial monetization without disclosure, authorization, or compensation. The harm to Plaintiff and the Class including but not limited to the interception and commercial exploitation of sensitive personal information and the financial value thereof is substantial, is not outweighed by any legitimate countervailing benefit, and could not reasonably have been avoided by Plaintiff or Class members.

105. Plaintiff and Class members suffered injury in fact and lost money or property as a result of Defendant's conduct. Browsing data identifying the specific content a user views, including browsing URLs of the kind intercepted here, has recognized and quantifiable economic value in the digital advertising marketplace. Each Tracker enabled by Defendant used that intercepted URL content to build behavioral profiles and to participate in real-time bidding auctions in which advertisers pay

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

measurable clearing prices for access to audiences identified by precisely this kind of browsing activity.

106. Plaintiff and Class members provided their browsing data as implicit consideration for access to the Website, a data-for-services exchange that was not disclosed and to which they did not consent. Defendant and the Trackers are designed to and on information and belief did capture the economic benefit of that exchange, in the form of advertising revenue and RTB clearing prices generated by the Trackers' use of users' intercepted URL data, without compensating Plaintiff or Class members. Plaintiff and Class members were thereby deprived of the economic value of their data and of the full value of a privacy-protective browsing experience they reasonably expected and would have bargained for had the exchange been disclosed.

107. Plaintiff and the Class are entitled to injunctive relief prohibiting Defendant from continuing its unlawful and unfair practices, restitution of monies acquired by Defendant through those practices, and reasonable attorney's fees pursuant to California Code of Civil Procedure § 1021.5.

## XI. FOURTH CAUSE OF ACTION

### Violation of the California Constitution, Article I, Section 1

### By Plaintiff and the Class Members Against All Defendants

108. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

109. Plaintiff brings this cause of action on behalf of himself and the Class.

110. Article I, Section 1 of the California Constitution provides that privacy is among the inalienable rights of all people in California. To state a claim for violation of the constitutional right to privacy, a plaintiff must establish: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by the defendant constituting a serious invasion of privacy.

111. Plaintiff and Class Members have a legally protected privacy interest in the contents of their electronic communications with the Website, including the specific

32

page URLs reflecting their browsing activity. California law recognizes a legally protected privacy interest in personal browsing activity, particularly when that activity is covertly intercepted by commercial third parties for advertising and profiling purposes without disclosure or consent.

112. Plaintiff and Class Members had a reasonable expectation of privacy in the contents of their electronic communications with the Website. A reasonable person visiting a major-metropolitan-newspaper digital news website like the Chicago Tribune does not expect that the specific pages they browse will be covertly transmitted to multiple separate third-party commercial tracking companies in real time, linked to persistent cross-session user profiles, and used for advertising targeting, behavioral analytics, and commercial monetization.

113. Defendant's conduct constitutes a serious invasion of that privacy. By deliberately embedding and configuring four third-party tracking technologies on the Website, Defendant caused the real-time, covert interception of the URL contents of Plaintiff's and Class Members' electronic communications and their transmission to third parties where they were linked to persistent cross-session profiles and used for commercial advertising and analytics purposes without Plaintiff's knowledge or consent. The severity of the invasion is heightened by the nature of the Website, the sensitivity of the content browsed, the persistent and cross-platform nature of the identifiers used, and the commercial exploitation of the intercepted data.

114. As a result of Defendant's invasion of their privacy, Plaintiff and Class Members have suffered harm, including loss of privacy, loss of control over their personal information, and the unauthorized commercial exploitation of their browsing activity. Plaintiff and the Class seek injunctive relief, nominal damages, and all other relief authorized by law.

///

///

## XII.   FIFTH CAUSE OF ACTION

### Intrusion Upon Seclusion

### By Plaintiff and the Class Members Against All Defendants

115.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

116.   Plaintiff brings this cause of action on behalf of himself and the Class.

117.   The common law tort of intrusion upon seclusion requires: (1) an intentional intrusion, physically or otherwise, into a place, conversation, or matter in which the plaintiff has a reasonable expectation of privacy; and (2) that the intrusion would be highly offensive to a reasonable person.

118.   Defendant intentionally intruded into Plaintiff's and Class Members' electronic communications with the Website by deliberately embedding four third-party tracking technologies that intercepted the URL contents of those communications in real time and transmitted them to third parties without Plaintiff's knowledge or consent. Plaintiff had a reasonable expectation of privacy in the contents of those communications.

119.   The intrusion is highly offensive to a reasonable person. Defendant covertly deployed tracking technologies that captured the specific content Plaintiff was browsing and transmitted it to multiple third-party commercial entities for advertising targeting and behavioral profiling. The covert and non-consensual nature of the interception, the nature of the Website and the sensitivity of the content browsed, the commercial exploitation of the intercepted browsing activity for advertising and data analytics purposes, and the use of persistent cross-session identifiers to build comprehensive user profiles without disclosure all render the intrusion highly offensive to a reasonable person.

120.   As a result of Defendant's intrusion upon their seclusion, Plaintiff and Class Members have suffered harm, including loss of privacy, emotional distress, and the unauthorized exploitation of their personal information. Plaintiff and the Class seek

34

compensatory damages, nominal damages, injunctive relief, and all other appropriate relief.

## XIII. SIXTH CAUSE OF ACTION

### Unjust Enrichment

### By Plaintiff and the Class Members Against All Defendants

121.  Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

122.  Plaintiff brings this cause of action on behalf of himself and the Class.

123.  Unjust enrichment requires: (1) a benefit conferred on the defendant; (2) at the expense of the plaintiff; and (3) circumstances that make it inequitable for the defendant to retain the benefit without compensating the plaintiff.

124.  Defendant received a benefit by permitting third parties to deploy their tracking technologies on the Website. In exchange for allowing these third parties to intercept and collect the URL contents of visitors' communications with the Website, Defendant received monetary compensation, data licensing benefits, promotional support, or other commercial value. Defendant's arrangement with these tracking operators enabled it to offer analytics, retargeting, and advertising services that generated commercial revenue and business value.

125.  Defendant received this benefit at Plaintiff's and Class Members' expense. Plaintiff's and Class Members' browsing data constitutes personal property with recognized economic value in the digital advertising marketplace. By intercepting the URL contents of Plaintiff's communications and transmitting them to third-party trackers, Defendant and its tracking partners extracted the commercial value of that data without compensation. Plaintiff and Class Members also suffered the loss of control over their personal information, which has recognized economic value as a privacy-protective property interest.

126.  It is inequitable for Defendant to retain the benefits of its data-for-services arrangement without compensating Plaintiff and Class Members whose browsing

activity was the source of that commercial value. Defendant's concealment of the tracking arrangement and its failure to obtain Plaintiff's and Class Members' informed consent render retention of those benefits unjust.

127.   Plaintiff and the Class seek restitution and disgorgement of all amounts by which Defendant was unjustly enriched at Plaintiff's and Class Members' expense.

## XIV.  <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays for the following:

1. An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;

2. An order declaring that Defendant's conduct violates Cal. Penal Code § 631(a), 18 U.S.C. § 2511(1)(a), Cal. Bus. & Prof. Code § 17200, et seq., Article I, Section 1 of the California Constitution, and the common law prohibition against intrusion upon seclusion;

3. An order enjoining Defendant from continuing the conduct alleged herein;

4. Statutory damages pursuant to Cal. Penal Code § 637.2(a)(1) of $5,000 per violation;

5. Statutory damages pursuant to 18 U.S.C. § 2520 of the greater of actual damages plus any profits made by Defendant through the violation, or $100 per day per violation or $10,000, whichever is greater;

6. Punitive damages pursuant to 18 U.S.C. § 2520;

7. Restitution pursuant to Cal. Bus. & Prof. Code § 17200, et seq.;

8. Nominal damages and injunctive relief for violation of Article I, Section 1 of the California Constitution;

9. Compensatory and nominal damages for intrusion upon seclusion;

10. Restitution and disgorgement of all amounts by which Defendant was unjustly enriched at Plaintiff's and Class Members' expense;

11. Prejudgment interest;

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

12. Reasonable attorney's fees and costs; and

13. Such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all causes of action and issues so triable.

Respectfully submitted,

Dated:   May 13, 2026

**LAW OFFICES OF ROSS CORNELL, APC**

By: */s/ Ross C. Cornell*
Ross Cornell, Esq. (SBN 210413)
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

**NATHAN & ASSOCIATES, APC**
Reuben D. Nathan
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

*Attorneys for Plaintiff and the Putative Class*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED