Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff, MICHAEL HANSON

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MICHAEL HANSON, on behalf of himself and all similarly situated persons,<br><br>Plaintiff,<br>v.<br><br>TRIBUNE PUBLISHING COMPANY, LLC, a Delaware limited liability company,<br><br>Defendant. | Case No. 5:26-cv-02571-JGB-ACCV<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>1) Cal. Penal Code § 631<br>2) 18 U.S.C. § 2511(1)(a)<br>3) Cal. Bus. & Prof. Code § 17200, *et seq.*<br>4) Cal. Constitution Art. I § 1<br>5) Intrusion Upon Seclusion<br>6) Unjust Enrichment |

Plaintiff MICHAEL HANSON ("Plaintiff") files this class action complaint on behalf of himself and all others similarly situated (the "Class Members") against Defendant TRIBUNE PUBLISHING COMPANY, LLC, a Delaware limited liability company ("Defendant" or "Tribune Publishing"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all others, by and through the investigation of undersigned counsel.

## I. NATURE OF THE ACTION

1. This is a class action lawsuit brought on behalf of all California residents who have accessed and used www.chicagotribune.com (the "Website"), a website that Defendant provides for public access and use.

2. During his use of the Website, Plaintiff navigated to multiple pages on the Website, unaware that Defendant was causing and permitting Third Parties to acquire the contents of his communications, including the addresses and titles of the specific pages he searched for and read. Plaintiff personally used the Website during the class period, including on May 2, 2026, and preserved an HTTP archive file of one of his own browsing sessions. An HTTP archive file is a record of the network exchanges between a browser and the servers with which it communicates, including the requests the browser sends, the headers and parameters those requests carry, and the responses received. Plaintiff's archive file accordingly records the requests his browser transmitted to the Third Parties during that session, including the named parameters carrying the contents of his communications and the persistent identifiers transmitted with them. The figures reproduced below are from an independent technical investigation counsel commissioned, which replicated the URLs and user flows recorded in the archive file, and are included as corroboration.

3. Defendant caused the interception of the contents of Plaintiff's communications with the Website, including the page URLs identifying what he was browsing and/or the referrer URLs reflecting prior navigation, which Defendant caused to be transmitted to the Third Parties during Plaintiff's use of those pages, including

transmissions to Comscore and The Trade Desk during the page-load process itself.

4. As set forth in the Specific Allegations section of this Complaint below, Defendant surreptitiously embeds and operates third-party tracking technologies on the Website that intercept the contents of users' electronic communications, including the page URLs reflecting what users are browsing, in real time and without notice or consent. Defendant intentionally deploys these technologies to accomplish its commercial objectives, including identity resolution, cross-session behavioral profiling, audience segmentation, and the monetization of users' browsing activity through targeted advertising and real-time bidding.

5. Defendant deploys these interception technologies in violation of the California Invasion of Privacy Act, Cal. Penal Code § 631, and the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a). Defendant has done so from prior to the beginning of the class period in this case and continuously through to today and ongoingly.

## II. GENERAL ALLEGATIONS

6. A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website that monitors user interactions. It typically appears as a small, transparent 1x1 image or a lightweight JavaScript snippet that activates when a webpage is loaded, or a user performs a tracked action.

7. When triggered, the pixel causes the user's browser to transmit data to third-party servers, including the contents of the user's communications with the Website such as page URLs identifying what the user is browsing, referrer URLs reflecting prior navigation, session-level identifiers, and browser and device characteristics.

8. When users visit the Website, Defendant causes tracking technologies to be embedded in visitors' browsers. These include, but are not limited to, the following:

- The Comscore Tracker
- The Trade Desk Tracker
- The LiveIntent Tracker

9. The third parties who operate the above-listed trackers use the intercepted

contents of users' communications collected via the Website for their own independent purposes tied to broader advertising ecosystems, profiling, and data monetization strategies, which go beyond Defendant's direct needs, for their own financial gain. The above-listed trackers are referred to herein collectively as the "Trackers" and their operators below are referred to collectively as the "Third Parties."

10. The Trackers are operated by distinct third parties, namely Comscore, Inc., also branded as Scorecardresearch (as to the Comscore audience-measurement tracker), The Trade Desk, Inc. (as to The Trade Desk programmatic-advertising integration), and LiveIntent, Inc. (as to the LiveIntent identity-resolution tag) (collectively, the "Third Parties"). Defendant knowingly embeds and deploys the Trackers on the Website to facilitate the third parties' interception of the contents of users' electronic communications.

11. The tracker-related code that Defendant caused to execute in Plaintiff's browser ran as part of the Website's delivery of each requested page, or while Plaintiff was engaged in his communication with the Website on that page, and without any further request or action by Plaintiff.

12. Plaintiff and the Class Members did not consent to the installation, execution, embedding, or injection of the Trackers on their devices and did not consent to the contents of their communications with the Website being intercepted by third parties. The Website did not display any consent banner, pop-up, cookie notice, or other authorization mechanism requesting permission before deploying the Trackers to intercept user communications. Defendant did not obtain express prior consent for the interception and transmission of the contents of users' communications for advertising, analytics, or monetization purposes.

13. Generalized references herein to users, visitors and consumers expressly include Plaintiff and the Class Members.

## III. PARTIES

14. Plaintiff MICHAEL HANSON is a California citizen residing in San

Bernardino County, CA and has an intent to remain there. Plaintiff was in California when he visited the Website, which occurred during the class period including but not limited to on May 2, 2026. The allegations set forth herein are based on the Website as configured when Plaintiff visited it.

15. Tribune Publishing Company, LLC is a Delaware limited liability company that owns, operates, and controls the Website, an online news platform through which Tribune Publishing publishes daily news, political reporting, local Chicago coverage, opinion essays, and editorial coverage of national and international current events for readers nationwide. Tribune Publishing operates a portfolio of major-metropolitan-newspaper digital properties and is a leading regional newspaper publisher.

16. Defendant maintains its principal offices in Chicago, Illinois. Through the Website and related digital platforms, Tribune Publishing conducts media and publishing business nationwide and serves readers in California and throughout the United States.

## IV. JURISDICTION AND VENUE

17. Tribune Publishing Company, LLC is subject to personal jurisdiction in this District under Federal Rule of Civil Procedure 4(k)(1)(A) and California's long-arm statute, Cal. Code Civ. Proc. § 410.10, which authorizes the exercise of jurisdiction on any basis not inconsistent with the United States or California Constitutions.

18. Tribune Publishing has cultivated California as a substantial market for its digital news, political reporting, opinion content, and editorial coverage. The Website serves as a primary digital channel through which Tribune Publishing distributes its national news, political reporting, opinion essays, and editorial content to California readers.

19. In furtherance of those operations, Tribune Publishing entered into and maintained commercial partnerships with California-headquartered data and advertising companies, including The Trade Desk, Inc., headquartered in Ventura, California. Tribune Publishing separately embedded the Comscore and LiveIntent integrations on

the Website.

20. Through those partnerships, Tribune Publishing embedded third-party tracking technologies into the Website that transmit California users' communications to data infrastructure and servers operated by California-headquartered companies, including The Trade Desk, Inc. Plaintiff, a California resident, accessed the Website from California; the interception of his communications occurred on his device in California; and the intercepted data flowed to servers operated by The Trade Desk, Inc., which operates from California. Plaintiff's claims arise directly from Tribune Publishing's purposeful direction of its Website and embedded data-collection systems at California residents and its use of California-based infrastructure to capture and exploit their private communications.

21. Tribune Publishing deliberately reached out beyond its home state of Delaware and its Chicago, Illinois principal offices by knowingly installing and configuring the Comscore, Trade Desk and LiveIntent integrations on the Website so that the resulting measurement, audience, identity-resolution and advertising functions could support Defendant's operation and monetization of the Website, in a manner that was neither random, isolated, nor fortuitous.

22. Tribune integrates the Website with a California-anchored ad-tech ecosystem extending beyond the Trackers identified in this Complaint. During Plaintiff's use of the Website, Tribune Publishing activated additional California-headquartered programmatic-advertising and identity-resolution partners, including Google LLC (Mountain View), Magnite, Inc. (Los Angeles), PubMatic, Inc. (Redwood City), and Nativo, Inc. (El Segundo). Tribune Publishing's deliberate integration with this California-anchored ecosystem confirms that Tribune Publishing purposefully directed its data-collection, tracking, and ad-monetization conduct at California.

23. Tribune Publishing's own Privacy Policy confirms the conduct alleged herein. The Privacy Policy expressly identifies the categories of personal information that Tribune Publishing collects from visitors to its Services, including information about

the specific pages of the Services visitors view, the search terms visitors submit through the Services, the content visitors interact with on the Services, and inferences drawn from that information about visitors' preferences and behavior.

24. Tribune Publishing's Privacy Policy further admits that Tribune Publishing discloses those categories of personal information to third parties for purposes of online analytics and interest-based advertising. The Cookie Policy correspondingly admits that Tribune Publishing uses cookies and other tracking technologies on its Platform, including third-party cookies set by advertisers, analytics providers, and other third-party providers, and that those cookies allow third parties to track users across Tribune Publishing's Platform.

25. These admitted categories of data, including the specific pages visitors view on the Services, the search terms visitors submit, content interactions, and inferences drawn from those interactions, constitute the substance of visitors' electronic communications with the Website, and are the same categories of content-level browsing data that the Trackers intercepted from Plaintiff during his visits to the URLs identified herein.

26. Tribune Publishing's purposeful direction of its tracking infrastructure at California, its commercial partnerships with California-headquartered Trackers, and its admissions in its own Privacy Policy and Cookie Policy collectively establish that Tribune Publishing has purposefully availed itself of the privilege of conducting activities in California and has purposefully directed its conduct at California residents.

27. Plaintiff's claims arise out of and relate to Tribune Publishing's forum-related conduct. Plaintiff's communications were acquired on his device in California, while Plaintiff was located in California, by integrations Tribune Publishing deliberately embedded on its Website, and the acquired contents were transmitted to servers operated by California-headquartered The Trade Desk, Inc. and other California-headquartered advertising-technology partners identified above.

28. Exercising specific personal jurisdiction over Tribune Publishing in this

District comports with constitutional notions of fair play and substantial justice. Tribune Publishing is an established media and publishing company with substantial commercial operations directed at California residents, and Tribune Publishing cannot reasonably claim surprise or undue burden from being haled into a California federal court to answer claims arising from interception of California residents' communications via Trackers Tribune Publishing itself embedded on its Website.

29. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff asserts a claim arising under federal law, specifically 18 U.S.C. § 2520, which provides a civil cause of action for violations of 18 U.S.C. § 2511(1)(a) of the Federal Wiretap Act.

30. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claim that they form part of the same case or controversy under Article III of the United States Constitution.

31. This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000, exclusive of interest and costs, there are over 100 members of the proposed Class, and minimal diversity of citizenship exists. Plaintiff is a citizen of California, and at least one Class Member is accordingly a citizen of a State different from that of Defendant, satisfying CAFA's minimal-diversity requirement.

32. Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b) because (1) Defendant regularly transacts business in this District, operates the Website that serves California residents in this District, and is subject to personal jurisdiction here; (2) a substantial part of the events or omissions giving rise to the claims occurred within this District, including Plaintiff's California-located use of the Website from his San Bernardino County residence; (3) Plaintiff resides in this District; and (4) Defendant derives substantial revenue from California consumers in this District.

/ / /

## V. ARTICLE III STANDING

33. During the visit described in this Complaint, Plaintiff used the Website to search for and to read particular material. His browser was caused to transmit the contents of those communications to three separate commercial entities that were not parties to them, and separately transmitted the search term Plaintiff typed to Google's analytics service in the manner alleged below. Each of the three received the address of at least one page Plaintiff viewed and, depending on the recipient, the title of that page, the address of the page he had viewed immediately before, and the section of the Website in which that page sat. Each transmission to those three entities carried, in the same outbound request, an identifier that the receiving entity had already assigned to Plaintiff's browser before this visit began.

34. The interest invaded is Plaintiff's interest in controlling information concerning his own person, and specifically in controlling who learns what he searched for and what he read.

35. The two pages at issue are https://www.chicagotribune.com/?s=transgender&orderby=date&order=desc (the "Search Page"), a search-results page generated by a term Plaintiff typed into the Website's search function, and https://www.chicagotribune.com/2026/04/13/trump-administration-agrees-to-keep-flying-rainbow-pride-flag-at-new-yorks-stonewall-monument/ (the "Article Page").

36. Comscore, Inc. received, in named parameters of requests Plaintiff's browser was caused to send to sb.scorecardresearch.com, the address of the Search Page, the address of the Article Page, the title of each page as displayed to Plaintiff, and, during the load of the Article Page, the address of the Search Page as the referring page.

37. The Trade Desk, Inc. received, in named fields of the body of requests Plaintiff's browser was caused to send to direct.adsrvr.org, the address of the Search Page, the address of the Article Page, the address of the Search Page as the referring page during the load of the Article Page, and the section of the Website in which each

page sat.

38. LiveIntent, Inc. received, in a named parameter of requests Plaintiff's browser was caused to send to rp.liadm.com and rp4.liadm.com, the address of the Search Page.

39. None of these three entities is affiliated with Defendant. Each operates its own commercial business in the collection, resolution and monetization of information about individuals across publishers, and each is able to use the record of Plaintiff's interaction with the Website for its own purposes.

40. Each of the three entities received the contents described above together with a persistent identifier that already existed in Plaintiff's browser when this visit began. Plaintiff's browser transmitted each such identifier outbound to its recipient before that recipient sent any instruction in this session to store it, which a browser does only for an identifier it is already holding. As to Comscore, the identifier transmitted also encodes on its face a date of first observation in June 2021, nearly five years before this visit. As to LiveIntent, a companion value stored on Defendant's own domain records that it was written on April 16, 2026, sixteen days before this visit.

41. Each of those identifiers was also set to persist forward. The identifiers transmitted to Comscore, to The Trade Desk and to LiveIntent were assigned lifetimes measured in hundreds of days and extending into 2027 and beyond. Where a recipient received more than one content-bearing transmission during Plaintiff's visit, the same identifier accompanied each of them, unchanged.

42. The identifiers are not confined to the individual page views at issue. Each of the three entities operates its services across unaffiliated publishers, and the identifiers described above are persistent identifiers assigned to Plaintiff's browser rather than identifiers created for, or limited to, a single page view of the Website. Comscore's published materials state that the cookie identifier it assigns is how Comscore identifies a browser and that it is associated with online activity information including browsing history and internet search activity.

43. The requests transmitted to The Trade Desk carried something further. Each request addressed to the publisher-specific endpoint included, in a named field within the same body, identifiers for Plaintiff's browser drawn from six identity namespaces: five assigned by identity services independent of The Trade Desk, and one being The Trade Desk's own identifier, restated a second time inside the payload. The Trade Desk therefore received the address of the page Plaintiff was reading together with the identifiers by which five other companies know the same browser.

44. Defendant's own Cookie Policy describes the same operation. It states that cookies set through Defendant's platform by its advertising partners "may be used by those companies to build a profile of your interests and show you relevant advertisements on other websites."

45. Each transmission that carried a privacy signal carried a value indicating that no opt-out had been applied.

46. Plaintiff took no separate action to initiate any of the transmissions to the three entities, and could not observe them. He requested only the pages he sought to read. Those transmissions were not resources he requested, were not necessary to deliver those pages to him, and were not visible to him at any point.

47. The transmissions were not limited to the three entities identified above. During the load of the Search Page, the address of that page was transmitted in a named field to dozens of distinct third-party hosts. During the load of the Article Page, the address of that page was transmitted in a named field to dozens of distinct third-party hosts.

48. The identifier The Trade Desk had assigned to Plaintiff's browser did not remain with The Trade Desk. During Plaintiff's session, his browser transmitted that same identifier in scores of separate requests to more than a dozen recipients other than The Trade Desk, in named fields including unifiedid, tdID, TDID and eid_adserver.org.

49. Many of those requests carried, in the same request, the address of a page Plaintiff was then reading. Multiple distinct recipients received both the identifier and a

page address in the same request, and did so on the load of the Search Page, again on the load of the Article Page, and again on Plaintiff's return to the Search Page.

50. During the load of the Article Page, those requests carried both addresses: the address of the Article Page, and, in the field identifying the referring page, the address of the Search Page. The record of what Plaintiff had searched for therefore did not remain with the search. It followed him to the article and was transmitted again from there.

51. The transmissions described above were not sequential or isolated. During each page load, the contents of Plaintiff's communication with the Website were duplicated and transmitted in parallel to multiple separate recipients, each of which received the same content at substantially the same time. None of those recipients delivered to Plaintiff the page content he had requested. Each instead received a separate advertising, analytics, audience-measurement, or identity-resolution request carrying the contents of the communication Plaintiff was then having with the Website.

52. The private fact acquired here is not the content of the pages, which anyone may read, but the fact that this particular browser searched for and read them. The search term was typed by Plaintiff and existed only because he entered it. A person may regard his own inquiry, and his choice of what to read, as private notwithstanding that the page he reaches is publicly available. A reasonable person regards being identified to commercial strangers as the person who ran that search and read that material as a private matter.

53. The record of what Plaintiff searched for and read conveys information about his interests and concerns, and is not merely a showing that an unidentified visitor viewed a publicly available page.

54. The harm Plaintiff suffered is of the same kind as the harm the common law has long protected against through the tort of intrusion upon seclusion, namely the acquisition by strangers, without the person's knowledge, of information concerning his private affairs. Here that information is what Plaintiff searched for and what he read,

acquired by commercial entities whose presence was not disclosed to him, and attributed to a browser those entities had already identified and continued to identify afterward. The comparison is one of kind. It does not depend on whether every element of that tort is established on these facts, and Plaintiff's standing to pursue the claims below does not rise or fall with any separate cause of action pleaded in this Complaint.

## VI. FEDERAL AND STATE PRIVACY LAWS

### 1. The California Invasion of Privacy Act (CIPA)

55. The California Invasion of Privacy Act (CIPA) is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications. The California Legislature recognized the significant threat posed by emerging surveillance technologies, stating that "the development of new devices and techniques for the purpose of eavesdropping upon private communications ... has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society" (Cal. Penal Code § 630).

56. Despite predating the Internet, CIPA has been applied to email and other Internet communications so long as that application is consistent with the statutory text and purpose. Section 631(a) reaches the interception of email content and online communications and consent under CIPA must be obtained before the interception occurs.

57. Individuals may pursue legal action against violators of Cal. Penal Code § 631 and are entitled to seek $5,000 in statutory penalties per violation. Cal. Penal Code § 637.2(a)(1).

### 2. The Federal Wiretap Act

58. The Federal Wiretap Act, enacted as Title III of the Omnibus Crime Control and Safe Streets Act of 1968 and amended by the Electronic Communications Privacy Act (ECPA) of 1986, prohibits the intentional interception of wire, oral, or electronic communications. Congress enacted the statute to safeguard the privacy of

communications against unauthorized interception, recognizing that unchecked surveillance technology poses a fundamental threat to individual liberty.

59. The Federal Wiretap Act applies to communications transmitted over the Internet. The 1986 ECPA amendments expressly extended the statute's protections to electronic communications as defined under 18 U.S.C. § 2510(12) to include "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." That includes data transmitted over the internet such as the contents of web browsing activity via HTTP requests as alleged here.

60. A person whose electronic communications are intercepted in violation of 18 U.S.C. § 2511 may bring a civil action pursuant to 18 U.S.C. § 2520(a). Available relief includes the greater of actual damages or statutory damages of $100 per day for each day of violation or $10,000, whichever is greater, plus punitive damages in appropriate cases, reasonable attorney's fees, and other litigation costs reasonably incurred.

## VII. SPECIFIC ALLEGATIONS

61. During his use of the Website, Plaintiff navigated to the following pages, unaware that Defendant was causing and permitting Third Parties to intercept the content of his communications:

- https://www.chicagotribune.com/?s=transgender&orderby=date&order=desc; and
- https://www.chicagotribune.com/2026/04/13/trump-administration-agrees-to-keep-flying-rainbow-pride-flag-at-new-yorks-stonewall-monument/.

62. The allegations that follow describe, for each of the Third Parties, the code Defendant caused to execute in Plaintiff's browser during Plaintiff's use of those pages, the contents of Plaintiff's communications that the code transmitted, the named fields in

which it transmitted them, and what the receiving Third Party does with what it receives.

**1.** ***The Comscore Tracker***

63. Defendant embedded and configured on the Website a measurement tag operated by Comscore, Inc. through its Scorecardresearch platform. Comscore is an independent company in the business of audience measurement and the analysis of online activity across publishers. It is not affiliated with Defendant.

64. The tag is configured to Defendant's own account. Every transmission described below carried, in a named parameter, the publisher and site identifier that Comscore issued to Defendant. The tag was not a resource Plaintiff requested and served no part of Plaintiff's request for the pages he sought to read.

65. When Plaintiff navigated to each of the two pages, his browser began loading that page from Defendant's servers. As part of that same page load, contemporaneously with it, and without any further request or action by Plaintiff, his browser executed the code of the Comscore tag that Defendant had placed on the page. That code obtained, from the browser's state for the page then loading, the address of that page, the title of that page, and the address of the page previously viewed. It wrote those values into the c7, c8 and c9 parameters of a new request, and directed Plaintiff's browser to send that request to Comscore's servers at sb.scorecardresearch.com. The values were taken from the live state of the page then in the course of being delivered. They were not retrieved from any stored record of Defendant's, and there was no intervening storage and later retrieval.

66. On Plaintiff's navigation to the Search Page, the request his browser sent to Comscore carried, in the c7 parameter, the full address of the Search Page including the search term Plaintiff had typed, and, in the c9 parameter, the address of the page previously viewed. In the c8 parameter it carried the title of that page as displayed to Plaintiff, which read as follows: Search Results for "transgender" – Chicago Tribune.

67. Figure 1 is a capture of a request transmitted to Comscore's servers at sb.scorecardresearch.com during navigation to the Search Page, showing Defendant's

Comscore publisher and site identifier, the page address in the c7 parameter and the page title in the c8 parameter.

**Figure 1**




68. On Plaintiff's navigation to the Article Page, the request his browser sent to Comscore carried, in the c7 parameter, the full address of the Article Page, and, in the c9 parameter, the address of the Search Page. In the c8 parameter it carried the headline of that article as displayed to Plaintiff, which read as follows: Trump administration agrees to keep flying rainbow Pride flag at New York's Stonewall monument – Chicago Tribune.

69. Figure 2 is a capture of a request transmitted to Comscore's servers during navigation to the Article Page, showing the same named parameters carrying the address of the Article Page and its headline.

/ / /

/ / /

**Figure 2**




70. Each of those requests carried, in the same outbound request as the content described above, a persistent identifier that Comscore had assigned to Plaintiff's browser before this visit began, and that Comscore instructed the browser to retain for a further period extending into 2027.

71. Comscore publishes an implementation specification for this tag, the Comscore Tag Specification for web page impressions, version 2.9.0, dated December 1, 2023. That specification states that the parameters identified above are collected automatically by the tag's own JavaScript code, and it identifies them, respectively, as the full page URL, the page title, and the referring URL.

72. The same specification describes the c7 parameter, which carries the page address, as required for correct attribution of traffic. It instructs publishers not to implement the tag inside ad calls or inside frames, because doing so may prevent that parameter from populating correctly. Defendant, which chose where on the Website to place the tag, was therefore instructed by Comscore as to what the page address is used for and as to what placement is necessary for Comscore to receive it.

73. The same specification instructs publishers how to confirm what the tag

sends. It directs the publisher to load the web page and to verify the tag's outbound request using a network inspection tool or the developer console of the browser, and to confirm that the request carries the publisher's identifier and that the c7 parameter contains the full page address including query string variables. It further states that the request will return a response code of 204, No Content. Comscore's servers returned that response code to each of the requests described above.

74. Comscore separately publishes that the cookie identifier it assigns is how Comscore identifies a browser, that the identifier is associated with online activity information including browsing history and internet search activity, and that Comscore may share tagging data for targeted advertising purposes.

75. The information was captured at the moment Plaintiff was reading, for the purpose of audience measurement, and not for any purpose of delivering to Plaintiff the pages he requested.

76. It was attributed on receipt to a particular browser, identified by an identifier Comscore had assigned before this visit and retained afterward, rather than counted anonymously.

77. Comscore's own specification states that the c7 parameter is required for correct attribution of traffic. Comscore therefore receives the address of the page Plaintiff was viewing for an operational purpose Comscore itself states, namely to attribute the measured page view correctly.

78. Attributing the page view correctly by means of that value requires Comscore to ascertain the page address transmitted in that field. An identifier alone does not disclose what page was viewed. Comscore does not receive the page address as inert routing information. It receives that address because the operation Comscore states it performs depends upon what the address says.

79. The title of the page and the address of the previously viewed page were transmitted in the same request, in the c8 and c9 parameters. Comscore's specification identifies each as a parameter its tag collects automatically. Their transmission was

accordingly a function of the tag's design and not an incident of routing.

80. The title of the page Plaintiff was reading was not transmitted to Comscore alone. During the same page loads, the title of each page was also transmitted, in named fields, to multiple additional third-party hosts, including in parameters named dt, page and ct, and within a structured payload that carried the title together with the address of the page.

81. Comscore, Inc. is not a party to the communications between Plaintiff and the Website. It is a third party that acquired the contents of those communications while they were in transit. Defendant aided, agreed with and employed Comscore to do so by embedding and configuring the Comscore tag on the Website and by supplying its own account identifier to it.

**2. *The Trade Desk Tracker***

82. Defendant embedded and configured on the Website a programmatic advertising integration operated by The Trade Desk, Inc. The Trade Desk is an independent company that operates a demand-side platform through which advertisers bid for advertising positions on the pages of publishers. It is not affiliated with Defendant.

83. The integration is configured to Defendant's own account. The requests described below were addressed to a path on The Trade Desk's servers that names Defendant, direct.adsrvr.org/bid/bidder/tribune, and each request separately identified Defendant within its body, in the fields stating the site domain and the publisher domain. The integration was not a resource Plaintiff requested and served no part of Plaintiff's request for the pages he sought to read.

84. When Plaintiff navigated to each of the two pages, his browser began loading that page from Defendant's servers. As part of that same page load, contemporaneously with it, and without any further request or action by Plaintiff, his browser executed code that Defendant had placed on the page. That code obtained, from the browser's state for the page then loading, the address of that page, the address of the

page previously viewed, and the identifier of each advertising position on that page. It wrote those values into named fields of a structured request body and directed Plaintiff's browser to transmit that body by HTTP POST to The Trade Desk's servers. The values were taken from the live state of the page then in the course of being delivered. They were not retrieved from any stored record of Defendant's, and there was no intervening storage and later retrieval.

85. On Plaintiff's navigation to the Search Page, the request his browser sent to The Trade Desk carried, in the field named site.page, the full address of the Search Page including the search term Plaintiff had typed, and in the field named site.ref, the address of the page previously viewed. The same request described two advertising positions, and for each of them it carried a value identifying the section of the Website in which that position appeared, in the form /4011/chicagotribune.com/search/ followed by the name of the position.

86. Figure 3 is a capture of a request transmitted to The Trade Desk's servers at direct.adsrvr.org during navigation to the Search Page, showing the publisher-specific endpoint naming Defendant and the named field carrying the address of the Search Page.

**Figure 3**



87. On Plaintiff's navigation to the Article Page, his browser sent four such requests. Each carried, in the field named site.page, the full address of the Article Page, and in the field named site.ref, the address of the Search Page. Each described advertising positions carrying values of the form /4011/chicagotribune.com/news/politics/ followed by the name of the position.

88. Figure 4 is a capture of a request transmitted to The Trade Desk's servers during navigation to the Article Page, showing the publisher-specific endpoint naming Defendant, the named field carrying the address of the Article Page, and the placement identifiers naming the section of the Website in which each advertising position appeared.

**Figure 4**




89. Those position values are not addresses of anything Plaintiff's browser requested. They are separate named values that state the section of the Website in which Plaintiff was reading, and each of them was transmitted three times within each request, in the fields named tagid, gpid and pbadslot.

90. Each request carried, in the same outbound transmission as the content

described above, a persistent identifier that The Trade Desk had assigned to Plaintiff's browser before this visit began. That same identifier value also appeared inside the body of the request itself, in the field the request format reserves for the buyer's identifier for that user.

91. Each request addressed to the publisher-specific endpoint further carried, in a named field within the same body, identifiers for Plaintiff's browser drawn from six identity namespaces, identified in the request as 33across.com, criteo.com, id5-sync.com, liveramp.com, pubcid.org and adserver.org. The first five are identity services independent of The Trade Desk. The sixth, adserver.org, is The Trade Desk's own namespace, and the identifier carried under it was the same identifier the request transmitted as a cookie, designated in the request as TDID.

92. Each request carried a privacy signal indicating that no opt-out had been applied. Each request also carried, in the field The Trade Desk designates for the browser's Do Not Track flag, the value that The Trade Desk defines to mean that tracking is unrestricted.

93. The Trade Desk publishes an implementation specification for this integration, The Trade Desk Standard Adapter. That specification states that its object model consists of a bid request and a bid response and is based on the IAB OpenRTB Real-Time Bidding API Specification, version 2.6, and that The Trade Desk does not use all objects and parameters included in that specification.

94. That specification sets out designations that, in The Trade Desk's own words, define how The Trade Desk uses the fields and processes bid requests when those fields are present or absent. It designates the site.page field, the address of the page where the impression is shown, as required for web impressions, and states that where a required field is missing The Trade Desk will drop the bid request or make it ineligible for certain buying workflows. It designates the site.ref field, the referring address that caused navigation to the current page, as recommended, and states that missing or null values in a recommended field can result in reduced bid eligibility or impression

devaluation.

95. That specification likewise designates as recommended the tagid field, which carries the identifier of the specific advertising placement, and states that accurate values in that field make The Trade Desk's optimization technologies for certain types of inventory more precise. It designates the user object as required for web impressions and the extended identifier field as recommended, and defines the extended identifier structure by reference to the identity provider that performed identity resolution and the match method it used.

96. The Trade Desk separately publishes documentation describing what its platform does upon receipt of a bid request. That documentation states that when The Trade Desk receives bid requests from publishers and supply-side platforms it matches those bid requests to bid lists and eligible advertising groups, multiplies the base bid by the bid factor for each matching line and determines the final adjustment, and calculates the final bid by multiplying the base bid for the advertising group by its associated bid lists, bid factors, key performance indicators, relevance factors, pacing and other signals. The same documentation states that when a bid request is received the final bid is calculated in that manner.

97. That documentation further states that the dimensions on which bid lines operate include site, and that an impression is matched against those dimensions, receiving an adjustment of zero, and therefore no bid, if it does not match a target list or if it matches a block list. The Trade Desk's separate documentation on multi-dimensional bidding states that combinations of dimensions such as site and ad placement are used to offer greater bid variety and more accurate targeting.

98. The Trade Desk's published reasons for declining to bid include reasons directed to the identity of the site, namely that the site is blocked, that the publisher is blocked, and that the site is not approved for the seller. Its specification states that the bid price, expressed in United States dollars on a cost-per-thousand basis, is always sent in a bid, and that each bid identifies the impression object in the bid request to which it

responds.

99. The Trade Desk's servers returned a response to each of the requests described above, within the same exchange.

100. The information was captured at the moment Plaintiff was reading, for the purpose of offering the advertising positions on the page he was reading, and not for any purpose of delivering to Plaintiff the pages he requested.

101. It was attributed on receipt to a particular browser, by an identifier The Trade Desk had assigned before this visit and carried both alongside and inside the request, and it arrived accompanied by the identifiers of five further identity services for the same browser.

102. A bid request is not a record deposited for later inspection. On The Trade Desk's own account, it is a request upon whose receipt The Trade Desk matches the request against bid lists and eligible advertising groups and calculates a bid. The Trade Desk requires the address of the page for a web bid request, and states that without it the request is dropped or made ineligible.

103. Matching the request against dimensions that include the site, and calculating a bid for an advertising position identified by a value stating the section of the Website in which Plaintiff was reading, requires The Trade Desk to ascertain what those values say. The Trade Desk does not receive the page address as inert routing information. It receives it as a term of the offer it is being asked to price.

104. The Trade Desk, Inc. is not a party to the communications between Plaintiff and the Website. It is a third party that acquired the contents of those communications while they were in transit. Defendant aided, agreed with and employed The Trade Desk to do so by embedding and configuring the integration on the Website and by directing the transmissions to an endpoint established for Defendant's own account.

**3. *The LiveIntent Tracker***

105. Defendant embedded and configured on the Website a tag operated by LiveIntent, Inc., which LiveIntent calls the LiveConnect tag. LiveIntent is an

independent company in the business of resolving the identity of individuals across publishers and of building and selling access to audiences assembled from what those individuals do online. It is not affiliated with Defendant. The tag was not a resource Plaintiff requested and served no part of Plaintiff's request for the pages he sought to read.

106. On Plaintiff's return to the Search Page, and while he was viewing that page, his browser executed the code of the LiveConnect tag that Defendant had placed on the page, without any further request or action by Plaintiff. That code obtained, from the browser's state for that page, the address of that page, and separately obtained the value of a cookie stored on Defendant's own domain. It wrote the page address into a parameter named pu and the cookie value into a parameter named duid, and directed Plaintiff's browser to send that request to LiveIntent's servers at rp.liadm.com and rp4.liadm.com. The values were taken from the live state of the page in Plaintiff's browser. They were not retrieved from any stored record of Defendant's.

107. Each of those requests carried, in the pu parameter, the full address of the Search Page including the search term Plaintiff had typed, and carried a privacy signal indicating that no opt-out had been applied.

108. Figure 5 is a capture of a request transmitted to LiveIntent's servers at rp.liadm.com while Plaintiff was viewing the Search Page, showing the address of the Search Page in the pu parameter and the persistent device identifier in the duid parameter. The value shown in the duid parameter is the same value shown in Figure 6 as the _lc2_fpi cookie stored on Defendant's own chicagotribune.com domain.

/ / /

/ / /

/ / /

## Figure 5




109. Each of those requests carried, in the same outbound request, a persistent identifier that LiveIntent had assigned to Plaintiff's browser before this visit began.

110. The value transmitted in the duid parameter was the value of a cookie stored not on LiveIntent's own domain but on Defendant's, at chicagotribune.com. A companion value stored beside it on Defendant's domain records that it was written on April 16, 2026, sixteen days before Plaintiff's visit. Defendant permitted that cookie to be placed within its own domain and permitted its value to be transmitted from Plaintiff's browser to LiveIntent.

111. LiveIntent publishes documentation for publishers describing what its tag does. Its frequently asked questions for publishers state that the tag registers page views from visitors and collects data such as the address of the page visited and the referring address, and that a domain cookie and a network identifier are also set.

112. LiveIntent separately publishes a page instructing publishers how to verify the tag. That page identifies the request to rp.liadm.com/j as the associated collector request, and directs the publisher to select that request in the browser's network panel

and to switch to the payload panel in order to view the data being collected and sent by LiveConnect.

113. The same page tells publishers how to read the contents of that request. It states that where the value of the se parameter is e30, that value decodes to an empty object and indicates that no custom event data is present, that is, a standard page view. Each of the requests Plaintiff's browser sent to LiveIntent carried the value e30 in the se parameter.

114. LiveIntent's implementation guide instructs publishers to place the tag across the website so that it loads on all pages. It states that once the tag has been installed on every page of a website, dynamic audiences for general page visits will automatically start populating. It describes the tag as one that powers people-based targeting, campaign optimization, and cross-device and cross-browser attribution.

115. LiveIntent's published description of its audience products states that dynamic audiences may be built from events, from page views, or from a combination of the two, using the LiveConnect tag, and describes an interest-driven audience that engages visitors who have browsed pages within a particular section of a website.

116. The information was captured at the moment Plaintiff was reading, for the purpose of identity resolution and audience building, and not for any purpose of delivering to Plaintiff the page he requested.

117. It was attributed on receipt to a particular browser, by a persistent identifier LiveIntent had assigned before this visit and by a value LiveIntent had caused to be written on Defendant's own domain sixteen days earlier.

118. On LiveIntent's own account of its tag, a page visit collected in this manner does not sit inert. Once the tag is deployed across a site, the page visits it collects automatically populate audiences, and those audiences may be defined by the pages, or the section of the site, that a visitor has browsed.

119. Determining whether a page visit places a browser within an audience defined by the pages or the section of a site that the visitor browsed requires LiveIntent

to ascertain what the transmitted page address says. LiveIntent does not receive the page address as inert routing information. It receives it because the operation it describes depends upon what the address identifies.

120. LiveIntent, Inc. is not a party to the communications between Plaintiff and the Website. It is a third party that acquired the contents of those communications while they were in transit. Defendant aided, agreed with and employed LiveIntent to do so by embedding and configuring the LiveConnect tag on the Website and by permitting LiveIntent's cookie to be written within Defendant's own domain and its value to be transmitted to LiveIntent.

**4. *Transmission of Plaintiff's User-Entered Search Term***

121. Defendant embedded and configured on the Website an analytics service operated by Google LLC, identified in the requests described below by a Google Analytics measurement identifier configured for the Website. The service was not a resource Plaintiff requested and served no part of Plaintiff's request for the pages he sought to read.

122. On each of Plaintiff's navigations to the Search Page, his browser was caused to send a request to Google's servers at analytics.google.com. That request carried, in a field named en, the value view_search_results, which is the event name Google uses to report that a user has been shown site-search results. It carried, in a separate field named ep.search_term, the value transgender. That value is the term Plaintiff typed into the Website's search function.

123. The same request carried, in a field named dl, the full address of the Search Page; in a field named dt, the title of that page as displayed to Plaintiff; and, in a field named cid, a persistent identifier for Plaintiff's browser. That identifier was the same value stored in the first-party cookie Google's analytics code maintains on Defendant's domain, and it already existed in Plaintiff's browser before this visit began.

124. On Plaintiff's navigation to the Article Page, the same service received, in the dl field, the address of the Article Page; in the dt field, the headline of that article as

displayed to Plaintiff; and, in the field named dr identifying the referring page, the address of the Search Page including the search term Plaintiff had typed.

125. The search term was not inferred from an address. It was transmitted in a field whose designated function is to carry the term the user searched for, within an event whose designated function is to report that the user was shown search results. What was transmitted was the word Plaintiff typed, not a resource locator from which that word might be derived.

**5. *Persistent Identifier Storage Across the Trackers***

126. The Trackers' persistent identifier mechanisms are stored on the visitor's browser as cookies. Figures 6 and 7 are Chrome DevTools Application panel captures showing the browser's cookie storage during the load of each of the two pages. The identifiers shown include third-party cookies on each Third Party's own domain and, on Defendant's own chicagotribune.com domain, the LiveIntent first-party cookie described above.

127. Figure 6 is a capture of the browser's cookie storage taken during the load of the Search Page, displayed alongside that page. It shows cookies stored on each Third Party's own domain and, on Defendant's own chicagotribune.com domain, the LiveIntent first-party cookie described above.

/ / /

/ / /

/ / /

**Figure 6**




128. Figure 7 is a capture of the browser's cookie storage taken during the load of the Article Page, displayed alongside that page, showing the same categories of tracker identifier cookies, with expirations extending into 2027.

**Figure 7**



129. Together, Figures 6 and 7 show that each of the Third Parties maintains an identifier cookie on the visitor's browser configured to persist well beyond a single page view, with expiration dates extending into 2027. As alleged above, Plaintiff's own archive file separately records the identifiers each recipient had assigned to his browser accompanying multiple content-bearing transmissions across his session.

**6. *Interception While in Transit***

130. When Plaintiff requested and viewed the pages, Defendant's Website caused both page-delivery code and tracker-related code to execute in Plaintiff's browser. The former delivered the content Plaintiff requested. The latter served no part of Plaintiff's request for that content.

131. The Third Parties did not obtain the contents of Plaintiff's communications from any stored record of Defendant's. There was no intervening storage and later retrieval. The values each Third Party received were read from the live state of the page in Plaintiff's browser, and they identified the page he was then viewing and no other.

132. As alleged above, the Comscore and Trade Desk transmissions occurred during the loading of each page and acquired the contents of Plaintiff's communications with the Website while those communications were in transit and passing over a wire. The LiveIntent transmission acquired the address of the Search Page from the live state of that page in Plaintiff's browser while he was engaged in his communication with the Website, and likewise acquired the contents of that communication while it was in transit and without any intervening storage and later retrieval.

133. No action by Plaintiff was required to bring the transmissions about, and none of them was visible to him.

134. The structures of the challenged requests, including the publisher, account, endpoint, placement and domain values specific to Defendant, establish that Defendant selected and configured the integrations that caused the transmissions and knew the categories of information the integration code was configured to transmit.

/ / /

**7. *Defendant's Knowledge and Configuration***

135. Defendant's own account identifiers travel on the transmissions. Defendant's Comscore publisher and site identifier is carried in a named parameter of every Comscore transmission, and the endpoint to which the Trade Desk transmissions were addressed is a path established for Defendant.

136. Defendant permitted a Third Party's cookie to be written within Defendant's own chicagotribune.com domain and permitted its value to be transmitted from Plaintiff's browser to that Third Party. Defendant caused or allowed that Third Party's code to execute within the first-party origin of its own domain and to write a cookie scoped to that domain, the value of which was then transmitted from Plaintiff's browser to the Third Party.

137. Defendant was instructed by Comscore, in Comscore's published specification, as to where on a page the tag must and must not be placed in order for the page address parameter to populate correctly, and Comscore's specification states that transmitting data to Comscore constitutes acceptance of a data sharing agreement.

138. Defendant's own Cookie Policy states that cookies set through Defendant's platform by its advertising partners may be used by those companies to build a profile of the visitor's interests and to show the visitor relevant advertisements on other websites. Defendant's own Privacy Policy identifies The Trade Desk by name among the third-party services Defendant uses.

139. Defendant's Cookie Policy further states that if a visitor uses the platform without changing cookie settings, the visitor's browser will receive all cookies used on the platform.

140. No policy was presented to Plaintiff before the transmissions described above occurred, and no policy identified interception of the contents of his communications by the Third Parties named in this Complaint.

/ / /

## VIII. CLASS ALLEGATIONS

141. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members") defined as follows:

> All persons in California who, between May 2, 2025 and the present, visited the Website and whose browser transmitted a page address, page title, search term, or other content of their communication with the Website to one or more of the Trackers.

142. NUMEROSITY: Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members can be ascertained by the records maintained by Defendant.

143. COMMONALITY: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions include but are not limited to:

- Whether Defendant configured the Website to transmit the URL contents of visitors' HTTP requests to the Trackers;
- Whether the URL contents of those requests constitute "contents" of electronic communications within the meaning of Cal. Penal Code § 631(a) and 18 U.S.C. § 2510(8);
- Whether Defendant's conduct constitutes interception of electronic communications in violation of Cal. Penal Code § 631(a);
- Whether Defendant's conduct constitutes intentional interception of electronic communications in violation of 18 U.S.C. § 2511(1)(a);
- Whether Defendant's conduct constitutes an unlawful or unfair business practice under Cal. Bus. & Prof. Code § 17200;
- Whether Plaintiff and Class Members are entitled to statutory damages;
- Whether Class Members are entitled to injunctive relief;
- Whether the Defendant's conduct violates the California Constitution;
- Whether the Defendant's conduct constitutes an intrusion upon

seclusion;

- Whether Class Members are entitled to restitution; and

144. TYPICALITY: As a person who visited the Website and whose URL contents were intercepted by the Trackers, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Trackers is typical to Class Members.

145. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

146. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation also presents a potential for inconsistent or contradictory judgments.

## IX. <u>FIRST CAUSE OF ACTION</u>

**Violations of Cal. Penal Code § 631**

**By Plaintiff and the Class Members Against Defendant**

147. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

148. Plaintiff brings this cause of action on behalf of himself and the Class.

149. California Penal Code section 631(a) imposes liability on any person who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state, and separately on any person who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things

mentioned above in this section. This cause of action is brought under the latter provision.

150. The contents of Plaintiff's and Class members' communications with the Website include the addresses of the pages they viewed, which state on their face the subject matter of the page; the search terms they typed, which are carried within the query strings of those addresses and, as alleged above, were also extracted and transmitted in a separate named parameter designated to carry the search term; and the titles of the pages they viewed, which were transmitted as separate named parameters. A page title is not an address. It does not direct, route, or address a communication to any destination; it states what the page says. The rationale that treats a uniform resource locator as functioning like an address therefore does not reach it. Each is content within the meaning of section 631(a).

151. The Third Parties are not parties to the communications between Plaintiff and the Website. Each is an independent company operating its own commercial data business, and each is able to use the record of the interaction for its own purposes. Defendant knew that the integrations it selected and installed transmitted the contents of its visitors' communications to the Third Parties, namely the addresses of the specific pages they viewed and, in Comscore's case, the titles of those pages, and it configured those integrations so that they would do so. Defendant thereby aided, agreed with and employed the Third Parties to read, and to attempt to read and to learn the contents and meaning of, those communications while they were in transit, by selecting, installing and configuring the integrations that caused the transmissions, by supplying its own Comscore publisher and site identifier to the Comscore tag, by directing the Trade Desk transmissions to an endpoint established for Defendant's own account, and by permitting LiveIntent's cookie to be written within Defendant's own domain and its value to be transmitted from Plaintiff's browser. Plaintiff and Class members did not consent to any of it, and no exception to section 631(a) applies.

152. Each interception constitutes a separate violation of section 631(a). Plaintiff

and the Class are entitled to recover the greater of actual damages or five thousand dollars per violation pursuant to California Penal Code section 637.2(a)(1), together with injunctive relief and such other relief as the Court deems just and proper. It is not a necessary prerequisite to an action under section 637.2 that the plaintiff has suffered, or be threatened with, actual damages. Cal. Penal Code section 637.2(c).

## X. SECOND CAUSE OF ACTION

### Violations of 18 U.S.C. § 2511(1)(a)

### By Plaintiff and the Class Members Against Defendant

153. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

154. Plaintiff brings this cause of action on behalf of himself and the Class.

155. 18 U.S.C. § 2511(1)(a) prohibits any person from intentionally intercepting any wire, oral, or electronic communication. The Federal Wiretap Act defines "contents" to include any information concerning the substance, purport, or meaning of a communication. 18 U.S.C. § 2510(8).

156. The contents identified above are contents of electronic communications within the meaning of 18 U.S.C. section 2510(8). As described in the preceding allegations, Comscore and The Trade Desk acquired those contents from the live state of the page then loading in Plaintiff's browser, contemporaneously with the page load and without any intervening storage and later retrieval, and therefore while those communications were in transit.

157. Defendant intentionally selected, installed, configured and operated the integrations described above, and thereby intentionally participated in the interception of the contents of Plaintiff's and Class members' electronic communications by the Third Parties. Defendant did so for the purpose that the Third Parties would associate the contents so acquired with the persistent identifiers and profiles those Third Parties already maintained for Plaintiff's and Class members' browsers, and would use that association to build and augment those profiles and to make them available for

advertising across other publishers. That association and augmentation is an act separate from, and subsequent to, the acquisition of the communications themselves. It invades the privacy interest alleged in the Fifth Cause of Action in its own right, because it joins the record of what Plaintiff read to a standing profile of the person to whom the identifier was already assigned, and makes that profile available for use across publishers, which the bare acquisition of the page address does not accomplish. This cause of action is pleaded in the alternative to the First Cause of Action.

158. Because the communications were intercepted for the purpose of committing that separate and independent tortious act, the exception in 18 U.S.C. section 2511(2)(d) does not apply. Plaintiff and the Class are entitled to relief under 18 U.S.C. section 2520, including the greater of actual damages plus any profits made by Defendant through the violation, or statutory damages of one hundred dollars per day per violation or ten thousand dollars, whichever is greater, together with punitive damages, reasonable attorney's fees, and litigation costs.

## XI. THIRD CAUSE OF ACTION

**Violations of Business & Professions Code § 17200**

**By Plaintiff and the Class Members Against Defendant**

159. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

160. Plaintiff brings this cause of action on behalf of himself and the Class.

161. California Business and Professions Code § 17200 prohibits any unlawful, unfair, or fraudulent business act or practice. Defendant's conduct constitutes both an unlawful and an unfair business practice.

162. Defendant's conduct is unlawful. By aiding, agreeing with and employing the Third Parties to acquire the contents of Plaintiff's and Class members' electronic communications while those communications were in transit, Defendant violated California Penal Code section 631(a). That statutory violation constitutes a predicate unlawful business act or practice under section 17200.

163. Defendant's conduct is also unfair. Defendant covertly caused the contents of Plaintiff's and Class members' communications with the Website, including the search term Plaintiff typed and the specific pages he read, to be transmitted to third-party recipients for commercial purposes without disclosure, authorization, or compensation. The harm to Plaintiff and the Class is substantial, is not outweighed by any legitimate countervailing benefit, and could not reasonably have been avoided by Plaintiff or Class members.

164. Plaintiff and Class members suffered injury in fact and lost money or property as a result of Defendant's conduct. Browsing information identifying the specific content a user views, including the page addresses and titles transmitted here, has recognized and quantifiable economic value in the digital advertising marketplace. On information and belief, each recipient used the content it received for the commercial function that recipient performs, namely audience measurement and attribution, the pricing of advertising bids, or the construction of addressable audiences.

165. Plaintiff and Class members provided their browsing data as implicit consideration for access to the Website, a data-for-services exchange that was not disclosed and to which they did not consent. Defendant and the Trackers are designed to and on information and belief did capture the economic benefit of that exchange, in the form of advertising revenue and RTB clearing prices generated by the Trackers' use of users' intercepted URL data, without compensating Plaintiff or Class members. Plaintiff and Class members were thereby deprived of the economic value of their data and of the full value of a privacy-protective browsing experience they reasonably expected and would have bargained for had the exchange been disclosed.

166. Plaintiff and Class members lack an adequate remedy at law for the ongoing conduct alleged. The statutory damages available under the First and Second Causes of Action are backward-looking and do not reach the continuing transmission of Class members' communications to the Third Parties, which will recur each time a Class member uses the Website unless enjoined. Restitution and injunctive relief under this

cause of action are accordingly sought in the alternative to, and are not duplicative of, the legal remedies sought above.

167. Plaintiff and the Class are entitled to injunctive relief prohibiting Defendant from continuing its unlawful and unfair practices, restitution of monies acquired by Defendant through those practices, and reasonable attorney's fees pursuant to California Code of Civil Procedure § 1021.5.

## XII. FOURTH CAUSE OF ACTION

**Violation of the California Constitution, Article I, Section 1**

**By Plaintiff and the Class Members Against Defendant**

168. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

169. Plaintiff brings this cause of action on behalf of himself and the Class.

170. Article I, Section 1 of the California Constitution provides that privacy is among the inalienable rights of all people in California. To state a claim for violation of the constitutional right to privacy, a plaintiff must establish: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by the defendant constituting a serious invasion of privacy.

171. Plaintiff and Class Members have a legally protected privacy interest in the contents of their electronic communications with the Website, including the specific page URLs reflecting their browsing activity. California law recognizes a legally protected privacy interest in personal browsing activity, particularly when that activity is covertly intercepted by commercial third parties for advertising and profiling purposes without disclosure or consent.

172. Plaintiff and Class Members had a reasonable expectation of privacy in the contents of their electronic communications with the Website. A reasonable person visiting a major-metropolitan-newspaper digital news website like the Chicago Tribune does not expect that the specific pages they browse will be covertly transmitted to multiple separate third-party commercial tracking companies in real time, linked to

persistent cross-session user profiles, and used for advertising targeting, behavioral analytics, and commercial monetization.

173. Defendant's conduct constitutes a serious invasion of that privacy. By deliberately embedding and configuring three third-party integrations on the Website, Defendant caused the contemporaneous, covert acquisition of the contents of Plaintiff's and Class Members' electronic communications and their transmission to third parties, where they were linked to persistent cross-session identifiers those third parties had assigned before the visit and retained afterward, without Plaintiff's knowledge or consent.

174. As a result of Defendant's invasion of their privacy, Plaintiff and Class Members have suffered harm, including loss of privacy, loss of control over their personal information, and the unauthorized commercial exploitation of their browsing activity. Plaintiff and the Class seek injunctive relief, nominal damages, and all other relief authorized by law.

## XIII. FIFTH CAUSE OF ACTION

### Intrusion Upon Seclusion

### By Plaintiff and the Class Members Against Defendant

175. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

176. Plaintiff brings this cause of action on behalf of himself and the Class.

177. The common law tort of intrusion upon seclusion requires: (1) an intentional intrusion, physically or otherwise, into a place, conversation, or matter in which the plaintiff has a reasonable expectation of privacy; and (2) that the intrusion would be highly offensive to a reasonable person.

178. Defendant intentionally intruded into Plaintiff's and Class Members' electronic communications with the Website by deliberately embedding and configuring three third-party integrations that acquired the contents of those communications in real time and transmitted them to third parties without Plaintiff's knowledge or consent.

Plaintiff had a reasonable expectation of privacy in the contents of those communications.

179. The intrusion is highly offensive to a reasonable person. What was acquired was not merely that Plaintiff visited a public website, but the specific search term he typed and the specific material he chose to read. Defendant covertly caused the specific pages Plaintiff searched for and read to be transmitted to three independent commercial entities, each of which received that content attributed to a persistent identifier it had assigned to his browser before the visit and retained afterward, and none of which was disclosed to him. The covert and non-consensual character of the acquisition, the nature and specificity of the information acquired, the number of independent recipients, and the persistence of the identifiers to which it was attributed render the intrusion highly offensive to a reasonable person.

180. As a result of Defendant's intrusion upon their seclusion, Plaintiff and Class Members have suffered harm, including loss of privacy, loss of control over information concerning themselves, and the unauthorized exploitation of their reading activity. Plaintiff and the Class seek compensatory damages, nominal damages, injunctive relief, and all other appropriate relief.

## XIV. <u>SIXTH CAUSE OF ACTION</u>

### Unjust Enrichment

### By Plaintiff and the Class Members Against Defendant

181. This cause of action is pleaded in the alternative, as a claim in quasi-contract for restitution. Plaintiff does not allege the existence of an enforceable contract governing the conduct at issue, and seeks restitution only of the benefits Defendant obtained from the contents of Class members' communications with the Website. Plaintiff does not seek by this cause of action any recovery duplicative of the damages sought under the First or Second Causes of Action.

182. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

183. Plaintiff brings this cause of action on behalf of himself and the Class.

184. Unjust enrichment requires: (1) a benefit conferred on the defendant; (2) at the expense of the plaintiff; and (3) circumstances that make it inequitable for the defendant to retain the benefit without compensating the plaintiff.

185. Defendant received a benefit by permitting the Third Parties to operate their integrations on the Website. On information and belief, Defendant received commercial value in the form of analytics, audience and advertising functionality supplied by the Third Parties in connection with those integrations.

186. Defendant received this benefit at Plaintiff's and Class Members' expense. Plaintiff's and Class Members' browsing data constitutes personal property with recognized economic value in the digital advertising marketplace. By intercepting the URL contents of Plaintiff's communications and transmitting them to third-party trackers, Defendant and its tracking partners extracted the commercial value of that data without compensation. Plaintiff and Class Members also suffered the loss of control over their personal information, which has recognized economic value as a privacy-protective property interest.

187. It is inequitable for Defendant to retain the benefits of its data-for-services arrangement without compensating Plaintiff and Class Members whose browsing activity was the source of that commercial value. Defendant's concealment of the tracking arrangement and its failure to obtain Plaintiff's and Class Members' informed consent render retention of those benefits unjust.

188. Plaintiff and the Class seek restitution of the benefits Defendant obtained from the contents of Class members' communications with the Website.

## XV. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays for the following:

1. An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;
2. An order declaring that Defendant's conduct violates Cal. Penal Code §

631(a), 18 U.S.C. § 2511(1)(a), Cal. Bus. & Prof. Code § 17200, et seq., Article I, Section 1 of the California Constitution, and the common law prohibition against intrusion upon seclusion;

3. An order enjoining Defendant from continuing the conduct alleged herein;
4. Statutory damages pursuant to Cal. Penal Code § 637.2(a)(1) of $5,000 per violation;
5. Statutory damages pursuant to 18 U.S.C. § 2520 of the greater of actual damages plus any profits made by Defendant through the violation, or $100 per day per violation or $10,000, whichever is greater;
6. Punitive damages pursuant to 18 U.S.C. § 2520;
7. Restitution pursuant to Cal. Bus. & Prof. Code § 17200, et seq.;
8. Nominal damages and injunctive relief for violation of Article I, Section 1 of the California Constitution;
9. Compensatory and nominal damages for intrusion upon seclusion;
10. Restitution of the benefits Defendant obtained from the contents of Class members' communications with the Website;
11. Prejudgment interest;
12. Reasonable attorney's fees and costs; and
13. Such other and further relief as the Court deems just and proper.

/ / /

/ / /

/ / /

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all causes of action and issues so triable.

Respectfully submitted,

Dated: August 28, 2026 **LAW OFFICES OF ROSS CORNELL, APC**

By: */s/ Ross C. Cornell*
Ross Cornell, Esq. (SBN 210413)
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

**NATHAN & ASSOCIATES, APC**
Reuben D. Nathan
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

*Attorneys for Plaintiff and the Putative Class*